**GENERAL ELECTRIC COMPANY, Appellant,**

v.

**IOWA STATE BOARD OF TAX REVIEW, Appellee.**

No. 04–0458.

Supreme Court of Iowa.

Aug. 12, 2005.

Bruce W. Baker of Nyemaster, Goode, West, Hansell & O'Brien, P.C., Des Moines, Walter Hellerstein of University of Georgia School of Law, Athens, Georgia, and William Booth of General Electric Company, Albany, New York, for appellant.

Thomas J. Miller, Attorney General, and James D. Miller, Assistant Attorney General, for appellee.

LARSON, Justice.

General Electric Company (GE) applied for a refund on its 1993 Iowa income tax based on a carryback of a capital loss sustained in 1995. The Iowa Department of Revenue and Finance (department) denied the refund, and GE appealed to the Iowa State Board of Tax Review. The board affirmed the denial of the refund, and GE petitioned for judicial review. The district court agreed with the board, and GE appealed to this court. We affirm.

## I. *Facts and Prior Proceedings.*

GE is a New York corporation doing business in Iowa. In 1993 it sold one of its subsidiaries, an aerospace business, realizing roughly $557,000,000 in capital gain. GE reported the capital gain on its federal and Iowa income tax returns. However, for Iowa tax purposes, this capital gain was classified as "nonbusiness," a term we discuss later, and therefore was allocated to, and taxed by, another state. The full amount of the capital gain in 1993 was deducted in calculating GE's Iowa taxable income; as a result, it was not taxed by Iowa.

In 1995 GE sold another subsidiary, a chemical business, and this time it realized a capital loss of almost $1.2 billion. Because, under federal tax law, a corporation's capital losses may only be recognized in an amount equal to its capital gains, *see* I.R.C. § 1211(a) (1995), the federal tax code allows corporations to "carry back" capital losses to previous tax years and offset the losses against capital gains recognized in those prior years. *Id.* § 1212(a)(1)(A). In this case, GE's only capital gain to which the carryback could be applied was the $557,000,000 gain in 1993. Accordingly, GE amended its federal 1993 return by carrying back $557,000,000 of its 1995 capital loss to offset the 1993 gain. This carryback reduced GE's federal taxable income in 1993 from $2,554,466,349 to $1,992,452,524. In 1995 GE also amended its 1993 Iowa return to reflect the $557,000,000 capital loss carryback. It sought a tax refund of $555,320, based on its amended return (roughly the tax on $557,000,000).

## II. *Iowa's Income Tax Scheme.*

We believe that a brief description of Iowa's income tax scheme is helpful to understand the issues in this case. Iowa's income tax scheme for corporations that derive income from Iowa and other states was explained in *Kraft, Inc. v. Iowa Department of Revenue & Finance*, 465 N.W.2d 664, 666 (Iowa 1991), *reversed on other grounds by* 505 U.S. 71, 112 S.Ct. 2365, 120 L.Ed.2d 59 (1992):

> Iowa income tax is imposed upon the portion of a taxpayer's "net income" attributable to its trade or business within Iowa. Iowa Code § 422.33. Section 422.35 defines "net income" as "the taxable income before the net operating loss deduction, as properly computed for federal income tax purposes...."

If a corporation has income sources from several states, Iowa splits the items comprising its net income into two types: business income and nonbusiness income.[1] The distinction between business and nonbusiness income is important because it determines whether an item of income is "allocated" to one specific state or "apportioned" among several states. *See* Iowa Code § 422.33(2)(*a*)-(*b*) (1993).

> When income is allocated, it is attributed to the particular state or states that are considered to be the source of the income, often on the basis of the location of the property that gave rise to the income or on the basis of the taxpayer's commercial domicile....

> When income is apportioned, on the other hand, it is divided among the various states in which the taxpayer derives such apportionable income. The mechanism for apportioning income among the states [is an apportionment formula].

Jerome R. Hellerstein & Walter Hellerstein, *State Taxation* ¶ 9.02 (3d ed.1999) (footnotes omitted). In general "all 'business income' is apportioned; all 'nonbusiness income' is allocated." *Id.; accord* Iowa Code § 422.33(2).

## III. *The Argument.*

Three lines in GE's original and amended 1993 returns are involved in this appeal. Line 1, entitled "Net Income From Feder-

---

1. Iowa Code section 422.32 (1993) defines both terms:

    2. *"Business income"* means income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations.

    ....

    7. *"Nonbusiness income"* means all income other than business income.

al Return," is the starting point for computing the Iowa income tax. *See* Iowa Code § 422.35; *First Nat'l Bank of Ottumwa v. Bair*, 252 N.W.2d 723, 725 (Iowa 1977). Line 8, entitled "Net Income After Reductions," shows the net income from line 1, less adjustments not relevant here. Line 9, entitled "Nonbusiness Income," provides the basis for apportioning and allocating taxable income. The amount shown there that is allocable to other states is deducted from line 8 to determine Iowa's taxable share.

Line 1 of GE's original 1993 return showed federal taxable income of $2,549,466,349. Line 1 of the amended return showed $1,992,452,524, which reflected the $557,000,000 loss carried back from 1995. The parties agree that line 1 of the amended return properly reported GE's net income for 1993 based on the loss carryback on the federal return.

Line 8, "net income," shown on GE's original return at $2,119,227,623, was reduced in its amended return to $1,562,213,798 to reflect the $557,000,000 reduction. Again, the parties agree that this figure is correct.

At line 9, the argument begins. The parties agree that the $557,000,000 capital gain was nonbusiness income, allocable in full outside of Iowa. The parties disagree, however, about whether line 9 on GE's amended return should include that gain. GE's figures on the original and amended returns at line 9 were identical, showing $768,051,794 as nonbusiness income. The department argues that, on the amended return, this amount must be reduced by the $557,000,000 loss carryback. GE disagrees; for purposes of allocating income away from Iowa in line 9, the $557,000,000 capital gain must remain included. This is so, it argues, because Iowa law mandates that this nonbusiness capital gain must be allocated in its entirety outside of Iowa. In other words, the $557,000,000 in question, as part of line 9, must be subtracted from line 8 and allocated outside of Iowa, even though that amount had already been deducted at line 1 by adopting the federal taxable income amount.

The department contends that the nonbusiness-allocation rules—used to calculate the line 9 figure—only apply to items of income contained *in* the taxpayer's Iowa net income—the figure found on line 8. In this case, because the $557,000,000 capital gain was completely offset at the federal level, none of that gain was included in GE's Iowa net income on line 8. The department argues that GE cannot allocate gain that was not included in the first instance. Allowing allocation of such items, according to the department, would amount to a double deduction and would also have the effect of offsetting capital loss against ordinary income, which is not permitted.

According to GE, the department's position ignores "the State's strong commitment to conformity to federal taxable income as the starting point for the determination" of Iowa income tax. GE asserts that this is

a commitment that sometimes creates "inequities" for taxpayers and sometimes creates "inequities" for the State. But these "inequities" are simply the cost of conforming the Iowa statute to the federal income tax—a cost that is far outweighed by the gains in administrative simplicity for both taxpayers and the state implementing Iowa's income tax system.

For the reasons to be discussed, the "inequity" in this case would fall on the state if GE's argument prevails.

## IV. *Standard of Review.*

Review of agency action is limited to correction of errors at law. Iowa R.App. P.

6.4; *IBP, Inc. v. Harpole,* 621 N.W.2d 410, 414 (Iowa 2001). "In reviewing the district court's decision, we apply the standards of Iowa Code [chapter 17A] to determine whether our conclusions are the same as those of the district court." *Grundmeyer v. Weyerhaeuser Co.,* 649 N.W.2d 744, 748 (Iowa 2002). If they are the same, we affirm; if not, we reverse. *Id.*

In reviewing agency action, this court gives deference to the agency's statutory interpretation, provided that the power to interpret the statute "has clearly been vested by a provision of law in the discretion of the agency." Iowa Code § 17A.19(10)(*l* ) (2003). In *City of Marion v. Iowa Department of Revenue & Finance,* 643 N.W.2d 205, 206–07 (Iowa 2002), we concluded that the legislature had vested in the director of the department of revenue the power to interpret tax statutes. Thus, we accorded the lenient deference described in section 17A.19(10)(*l* ) to the agency's official interpretation as reflected in its regulations. *City of Marion,* 643 N.W.2d at 207; *accord* Iowa Code § 17A.19(11)(*c* ). In this case, however, neither party has identified an agency regulation that is directly on point. The agency has no official interpretation to which this court should defer; thus, we will reach our own conclusion regarding the proper interpretation of the relevant statutes.

## V. *Statutory Interpretation.*

■ This court considers several rules when construing statutes:

(1) In considering legislative enactments we should avoid strained, impractical or absurd results.

(2) Ordinarily, the usual and ordinary meaning is to be given the language used but the manifest intent of the legislature will prevail over the literal import of the words used.

(3) Where language is clear and plain, there is no room for construction.

(4) We should look to the object to be accomplished and the evils and mischiefs sought to be remedied in reaching a reasonable or liberal construction which will best effect its purpose rather than one which will defeat it.

(5) All parts of the enactment should be considered together and undue importance should not be given to any single or isolated portion.

(6) We give weight to the administrative interpretation of statutes, particularly when they are of longstanding.

(7) In construing tax statutes doubt should be resolved in favor of the taxpayer.

*Welp v. Iowa Dep't of Revenue,* 333 N.W.2d 481, 483–84 (Iowa 1983); *accord Gen. Elec. Co. v. Iowa State Bd. of Tax Rev.,* 492 N.W.2d 417, 420 (Iowa 1992).

■ This case turns on the interplay between the statutory definition of "net income" and the statutory rules regarding apportionment and allocation. The department contends that the only items of income subject to allocation and apportionment are those items included in GE's Iowa net income. GE, conversely, argues that the statute imposes no such limitation; according to GE, the deciding factor is the label of "nonbusiness income" assigned to the 1993 capital gain. GE asserts that, because the gain is nonbusiness and originated in another state, the allocation-apportionment rules mandate that such gain be allocated to that state and deducted from GE's Iowa net income.

A. *Plain meaning of the statute.* The department argues, and the district court ruled, that GE's interpretation conflicts with the plain language of the statute. The statute's plain language creates a natural order of calculation. First, a taxpay-

er must determine its Iowa "net income," as all Iowa taxes are based on that figure. *See* Iowa Code § 422.33(1). Section 422.35 defines "net income" as "the taxable income before the net operating loss deduction, as properly computed for federal income tax purposes...." We have interpreted this language to mean that the starting point for calculating a corporation's Iowa net income is its federal taxable income. *See First Nat'l Bank,* 252 N.W.2d at 725.

Section 422.35 then provides a number of "adjustments," which modify the federal taxable income figure. *See* Iowa Code § 422.35(1)-(16). After these adjustments are made, the resulting figure is the taxpayer's Iowa "net income."

Finally, after the taxpayer calculates its Iowa "net income," the process of allocating and apportioning that income begins. This is so because the legislature specifically provided that the allocation-apportionment rules are used to calculate the *"portion* of the [taxpayer's] *net income* reasonably attributable" to sources within Iowa. Iowa Code § 422.33 (emphasis added). As a matter of linguistic logic, a *portion* of the whole cannot be allocated before "the whole" has been identified. Thus, by employing the statutorily defined term "net income" in section 422.33, the legislature obviously intended to delay the application of the allocation-apportionment rules until after the taxpayer's "net income" has been calculated. In so doing, the legislature limited the rule's applicability to only those items of income included in the net income figure. In other words, only those items that make up the taxpayer's "net income" are subject to allocation and apportionment.

B. *Statutory purpose and legislative intent.* This interpretation reinforces the legislature's goal in enacting the statute—the creation of an efficient yet constitution-al corporate tax system. The legislature met its efficiency goal by basing Iowa taxes on the taxpayer's federal taxable income. *See* Iowa Code § 422.35. Our system

> is convenient for the taxpayer, prevents the taxpayer from spending time and money on complex forms, provides a saving to the state, allows the state to rely on federal regulation and interpretation, and provides the state with an inexpensive and quick way of verifying the accuracy of taxpayers' returns.

*Kraft,* 465 N.W.2d at 669, *rev'd on other grounds by* 505 U.S. 71, 112 S.Ct. 2365, 120 L.Ed.2d 59; *see also Comptroller of Treasury Income Tax Div. v. Am. Satellite Corp.,* 312 Md. 537, 540 A.2d 1146, 1150 (1988) (citing efficiency as one reason the legislature adopted the taxpayer's federal taxable income as the base figure in determining state income tax liability).

If we were to adopt GE's interpretation, it would hinder this efficiency objective because taxpayers and taxing entities alike would be forced to look beyond the taxpayer's federal taxable income and consider each item of gain and loss used in calculating that figure. *See Am. Satellite Corp.,* 540 A.2d at 1150 (stating that the comptroller's interpretation—which was quite similar to GE's—would frustrate the legislature's goal of efficiency). Certainly this is not the result the legislature intended.

Moreover, GE's interpretation does nothing to further the legislature's goal of constitutionality. The statute classifies income as either business or nonbusiness income simply to avoid unconstitutionally taxing taxpayers' extraterritorial income. However, if an item of extraterritorial income is not included in the taxpayer's Iowa net income to begin with, there is no risk of overtaxing, and thus allocation is no longer necessary.

C. *The department's long-standing interpretation.* The department has a long-

standing rule regarding capital-loss carrybacks that supports its interpretation. *See* Iowa Admin. Code r. 701—53.3(1). That rule states:

> Capital losses shall be allowed or allowable for Iowa corporation income tax purposes to the same extent they are allowed or allowable for federal corporation income tax purposes. Capital loss carrybacks shall be treated as *an adjustment to federal taxable income* to arrive at *net allocable and apportionable income.*

*Id.* (emphasis added). Again, this rule contemplates a scheme in which only items of income included in the taxpayer's federal taxable income are subject to allocation and apportionment. This rule supports the department's position in this case.

D. *Avoidance of strained or absurd results.* In interpreting statutes, "we should avoid strained, impractical or absurd results." *Gen. Elec. Co.*, 492 N.W.2d at 420. GE argues that, if the department's view prevails, it would result in unfortunate and "unintended" consequences. For example, if a taxpayer who has a capital gain otherwise taxable to Iowa also has a capital loss in another state in a larger amount, Iowa would receive no tax because the capital loss from the other state would wipe out the Iowa gain in the taxpayer's federal taxable income figure at line 1. The department concedes that this could happen, but observes that this is simply a cost of adopting a taxing scheme that relies on conformity with federal tax law. *See Kraft*, 465 N.W.2d at 669 (explaining advantages of conformity).

The hypothetical offered by GE is not involved in this case; however, a Maryland court, applying similar federal conformity law, considered such a case and reached exactly the conclusion advanced by the department. *See Am. Satellite Corp.*, 540 A.2d 1146. Maryland's tax scheme, like Iowa's, uses the corporation's federal taxable income as the starting point. In *American Satellite Corp.*, the taxpayer realized a capital gain of $5,000,000, all of which was allocable to Maryland. 540 A.2d at 1148. However, the company had federal net-operating losses of over $51,000,000 from previous years, which completely offset the capital gain and reduced the taxpayer's federal taxable income to zero. Thus, the taxpayer reported Maryland net income of zero and did not pay any state tax. The Maryland comptroller determined a deficiency because, in his opinion, the $51,000,000 of offsetting net-operating loss was apportionable among the states. *Id.* The comptroller found that only $1,300,000 of the net operating loss was allocable to Maryland, so the taxpayer owed state tax on the remaining $3,700,000. *Id.*

The Maryland Court of Appeals did not agree with the comptroller's calculation and, instead, found for the taxpayer. Under its reading of the statute, "the federal taxable base [is] a ceiling on net income subject to Maryland tax." *Id.* at 1149. Moreover, the court criticized the comptroller's strained interpretation:

> The statute clearly imposes a tax only on "such *portion* [of net income] as *is* allocable to this State under the [allocation-apportionment rules]." (Emphasis added.) [The allocation-apportionment rules] cannot be used to create additional net income as a 'portion' cannot be more than the whole.

*Id.* at 1151.

We find this logic equally applicable here. Our allocation-apportionment rules cannot be used to allocate a "portion" of the whole if that portion was never part of the whole in the first place. In other words, if an item of the taxpayer's federal gross income is completely offset in calculating its federal taxable income—and therefore is not part of its Iowa net in-

come—then that item is not subject to Iowa's allocation-apportionment rules.

GE raises other hypothetical scenarios that, it contends, would make the department's interpretation of our tax statutes unworkable. We disagree. In any event, the facts in those scenarios are not before us now, and we need not speculate how those cases would be resolved. One scenario that requires no speculation, however, is the effect in this case if we adopted GE's argument: GE would obtain a "refund" of taxes that it had never paid to Iowa. That is so because, as the parties agree, the entire 1993 capital gain from the sale of GE's aerospace business was allocated away from Iowa in its original 1993 return.

It is true that generally in construing tax statutes doubts will be resolved in favor of the taxpayer. *Gen. Elec.*, 492 N.W.2d at 420. We do not believe that the meaning of the tax statutes here is in doubt; in fact, their language is quite clear. Moreover, as we noted in *General Electric*, other rules of construction also apply, one of which is to avoid strained, impractical, or absurd results. *Id.* At least impliedly based in part on this rule of construction, we held in *General Electric* that an income-tax refund, admitted by the taxpayer to be a windfall, would not be allowed. *Id.* at 421–22. Here, the "refund" requested by GE, amounting to over $550,000, would be a windfall not mandated or even permitted by our law. The department properly denied the claim, and we affirm the district court's decision so holding.

**AFFIRMED.**

All justices concur except STREIT, J., who takes no part.