# IN THE SUPREME COURT OF IOWA

No. 07–1534

Filed October 8, 2010

**THE SHERWIN-WILLIAMS COMPANY,**

Appellee,

vs.

**IOWA DEPARTMENT OF REVENUE,**

Appellant.

_____

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Carla T. Schemmel, Judge.

Department of Revenue seeks further review of court of appeals' decision affirming district court's decision on judicial review that taxpayer was entitled to an exemption from use tax. **DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED; CASE REMANDED.**

Thomas J. Miller, Attorney General, and Marcia E. Mason, Assistant Attorney General, for appellant.

Bruce W. Baker of Nyemaster, Goode, West, Hansell & O'Brien, P.C., Des Moines, and John A. Panno, Joseph F. Timmons, and Laura T. Gorjanc of The Sherwin-Williams Company, Cleveland, Ohio, for appellee.

**TERNUS, Chief Justice.**

The appellee, The Sherwin-Williams Company, paid Iowa use tax on certain machines used in its Iowa retail outlets to mix base paint with colorant. The appellant, Iowa Department of Revenue, denied Sherwin-Williams' refund claim for these taxes, refusing to apply the so-called manufacturing exemption set forth in Iowa Code section 422.45(27)(*a*)(1) (1999).[1] On judicial review, the district court reversed the department's ruling, and the Iowa Court of Appeals affirmed the district court. We granted the department's application for further review. Concluding the exemption applies, we affirm the decision of the court of appeals and the judgment of the district court.

## I. Background Facts and Proceedings.

Sherwin-Williams is an Ohio-based company that manufactures, distributes, and sells paint and paint-related products. It owns and operates thirty-eight retail outlets in Iowa and, in addition, sells its products to independent retail stores such as Menards, Home Depot, and Lowes. Since the 1960s, Sherwin-Williams has used a decentralized manufacturing process that requires retailers to mix colorants with a base liquid according to precise formulas to create usable paint.[2]

To implement this process, each Sherwin-Williams retail location must have a spectrographic color-matching machine that determines the mixing formula to achieve the precise color desired; a dispensing/tinting machine, known as a mini accutinter, to insert the colorant into the base; and a mixer/shaker to combine the colorant and base. The base is a thick liquid

---

[1]This Code section is now found at Iowa Code section 423.3(47)(*a*)(1) (2009).

[2]Paint has approximately a one-year shelf life after colorant is added to the base. The decentralized system allows the company to offer 3000 color choices in different sheens without maintaining a large inventory or disposing of great quantities of unsold product, which is classified as a hazardous waste.

composed of binders and resins. The colorant, which contains additives such as glycol and water, gives the base paint flow and leveling abilities. Neither the colorant nor the base is salable at retail or usable by itself.

This legal proceeding began when Sherwin-Williams filed a refund claim for use taxes it paid from July 1, 1992, through December 31, 2000, on the machinery used to produce paint in its Iowa stores. It contended it had no liability for use tax, relying on a manufacturing exemption contained in Iowa Code section 422.45(27)(*a*). The department denied a refund for taxes paid prior to July 1, 1997, the effective date of an amendment to the manufacturing exemption that expanded its scope, and issued a refund check for taxes paid after the amendment went into effect. Sherwin-Williams requested a review of the department's denial of a refund of pre-July 1, 1997 taxes. This review request prompted the department to ask the company for additional information. Upon reviewing the additional information submitted by Sherwin-Williams, the department not only refused to change its denial of a refund for pre-July 1, 1997 taxes, but also revoked its earlier decision granting a refund for the post-July 1, 1997 taxes. Thereafter, Sherwin-Williams formally withdrew its request for a refund of taxes paid prior to the 1997 expansion of the manufacturing exemption.

The department then issued a notice of tax due in the amount of the original refund plus interest, which was followed by a notice of assessment. Sherwin-Williams filed a protest, prompting an evidentiary hearing before an administrative law judge (ALJ). The ALJ issued a proposed decision that Sherwin-Williams was a "manufacturer" as that term is defined by statute, exempted from payment of use taxes by section 422.45(27)(*a*). The department appealed, and the department director issued a final decision that Sherwin-Williams was not a "manufacturer" and did not qualify for the exemption. The agency decision was reversed by the district court on

judicial review. As noted above, the court of appeals affirmed the district court. This court granted the department's application for further review.

## II. Applicable Statutes and Administrative Rules.

It is helpful to provide a context for our discussion of this case by first reviewing the applicable statutes and agency rules. At the time relevant to this lawsuit, Iowa Code section 423.2 imposed a five percent tax "on the use in this state of tangible personal property purchased for use in this state," calculated on the purchase price of the property. Iowa Code section 423.4(4) exempted from use tax tangible personal property exempt from sales tax under section 422.45. At issue in this case is the manufacturing exemption set forth in section 422.45(27)(*a*)(1).

Prior to 1997, certain sales of machinery and equipment were exempted from use tax, including

> [t]he gross receipts from the sale . . . of industrial machinery, equipment and computers . . . if the following conditions are met:
>
> > *a.* The industrial machinery, equipment and computers shall be *directly and primarily used in the manner described in section 428.20 in processing tangible personal property* or in research and development of new products or processes of manufacturing, refining, purifying, combining of different materials or packing of meats to be used for the purpose of adding value to products . . . .
> >
> > . . . .
> >
> > *b.* The industrial machinery, equipment and computers *must be real property* within the scope of section 427A.1, subsection 1, paragraph "*e*" or "*j*".

Iowa Code § 422.45(27) (1997) (emphasis added). Iowa Code section 428.20, to which reference is made in paragraph (*a*), states:

> A person who purchases, receives, or holds personal property of any description for the purpose of adding to its value by a process of manufacturing, refining, purifying, combining of different materials, or by the packing of meats, with a view to selling the property for gain or profit, is a "*manufacturer*" for the purpose of this title.

Iowa Code § 428.20. Section 427A.1(1)(*e*), to which reference is made in paragraph (*b*), provides that "[m]achinery used in manufacturing establishments" is assessed and taxed "as real property." The term "manufacturing establishments" was not defined in the tax statutes. An agency rule, however, provided the following definition:

> A manufacturing establishment is a business entity in which *the primary activity* consists of adding to the value of personal property by any process of manufacturing, refining, purifying, the packing of meats, or the combination of different materials with the intent of selling the product for gain or profit.

Iowa Admin. Code r. 701—71.1(6)(*a*) (emphasis added).

During the 1997 legislative session, section 422.45(27) was amended. 1997 Iowa Acts ch. 87, § 1. According to the explanation contained in the house bill that was adopted by the legislature, the bill rewrote the statute "by defining those manufacturing activities which give rise to the [sales and use tax] exemption." H.F. 126, 77th G.A., Reg. Sess., explanation (Iowa 1997). As of July 1, 1997, the effective date of this amendment, section 422.45(27)(*a*) exempts the following receipts from use tax:

> The gross receipts from the sale or rental of computers, machinery and equipment . . . if such items are any of the following:
> (1) Directly and primarily used in processing *by a manufacturer.*

Iowa Code § 422.45(27)(*a*)(1) (1999) (emphasis added). Iowa Code section 422.45(27)(*d*)(4) provides that " '*[m]anufacturer*' means as defined in section 428.20."

A comparison of the pre and postamendment versions of this statute reveals two notable changes effected by the amendment. First, the requirement that the items sold "be real property," i.e., "used in manufacturing establishments," was eliminated. Second, the amendment changed the interplay between the manufacturing exemption and section

428.20. Under the amended statute, the equipment must be used "by a manufacturer" as defined in section 428.20. Prior to the 1997 amendment, the statute only required that the equipment be used "in the manner described in section 428.20." The fiscal note that accompanied the bill predicted a decrease in revenue to the general fund of approximately $4 million in fiscal year 1998 and thereafter. H.F. 126, 77th G.A., Reg. Sess., fiscal note (Iowa 1997). We conclude from this information that the general assembly understood the amendment would have the effect of broadening the applicability of the manufacturing exemption, thereby resulting in less sales and use tax collections.

The department's primary argument in support of its position that the amended exemption does not apply under the facts of this case is that Sherwin-Williams is not a "manufacturer" for purposes of machinery used in its retail operation.[3] The department relies in part on its administrative rule defining the term "manufacturer":

> "*Manufacturer*" means any . . . corporation that purchases, receives, or holds personal property for the purpose of adding to its value by any process of manufacturing, refining, purifying, combining of different materials, or by packing of meats with an intent to sell at a gain or profit.

Iowa Admin. Code r. 701—18.58(1). This definition essentially mirrors the statutory definition of "manufacturer." *Compare id., with* Iowa Code § 428.20. The departmental rule goes on, however, to provide examples of businesses that do and do not fall within this definition:

> Those who are in the business of printing, newspaper publication, bookbinding, lumber milling, and production of drugs and agricultural supplies are illustrative, nonexclusive examples of manufacturers. Construction contracting;

---

[3]The department also contends the spectrographic color-matching machines fail to qualify for the exemption for the additional reason that they are not "directly used" in processing as required by the manufacturing exemption. We discuss this contention separately below.

> remanufacture or rebuilding of tangible personal property (such as automobile engines); provision of health care; farming; transportation for hire; and the activities of restaurateurs, hospitals, medical doctors, and those who merely process data are illustrative, nonexclusive examples of businesses which are not manufacturers. See *Associated General Contractors of Iowa v. State Tax Commission*, 255 Iowa 673, 123 N.W.2d 922 (1963) and *River Products Co. v. Board of Review of Washington County*, 332 N.W.2d 116 (Iowa Ct. App. 1982). The term "manufacturer" includes a contract manufacturer. Ordinarily, the word does not include those commercial enterprises engaged in quarrying or mining.

*Id.*

Before we consider whether the department correctly decided that Sherwin-Williams was not entitled to the manufacturing exemption for equipment used in its retail outlets, we must determine the appropriate standard of review.

### III.  Scope of Review.

Our review of this agency decision is governed by Iowa Code chapter 17A.  *See* Iowa Code § 17A.19.[4]  The department asserts it has discretion to interpret the statutory manufacturing exemption and, therefore, urges us to apply the standard of review reserved for matters vested in the discretion of the agency:

> The court shall reverse, modify, or grant other appropriate relief from agency action, equitable or legal and including declaratory relief, if it determines that substantial rights of the person seeking judicial relief have been prejudiced because the agency action is any of the following:
>
> . . . .
>
> *l.* Based upon an irrational, illogical, or wholly unjustifiable interpretation of a provision of law *whose interpretation has clearly been vested by a provision of law in the discretion of the agency.*

*Id.* § 17A.19(10)(*l*) (emphasis added).  Relying on this standard of review, the department claims its interpretation of section 422.45(27)(*a*)(1)—the

---

[4]All references to the Iowa Administrative Procedure Act are to the 2009 Iowa Code.

manufacturing exemption—can be overturned only if it is "irrational, illogical or wholly unjustifiable." *Id.*

Sherwin-Williams argues only an agency's "official" interpretation of a statute is entitled to deference, and here, the department has no rule on point to which deference could be given. On the latter point, we agree. The application of the manufacturing exemption in this case turns initially on whether Sherwin-Williams is a "manufacturer" for purposes of its use of the equipment at issue. With a few insignificant changes, the department's rule defining the term "manufacturer" simply parrots the statutory definition of this term, and consequently, the rule does not *interpret* the statute. *See Webster's Third New International Dictionary* 1182 (unabr. ed. 2002) (defining "interpret" as "to explain or tell the meaning of"). The text that follows the rule's paraphrasing of the statutory definition lists examples of businesses that do and do not fall within that definition. In our view, this part of the rule represents the department's illustrative *application* of the statutory definition to specific businesses. We conclude, therefore, that the department has not further explained—by rule—the meaning of the term "manufacturer."

We consider, then, whether only an agency's interpretation of a statute as embodied in an agency rule is entitled to deference or whether an agency's interpretation of a statute in a specific matter pending before it can also be accorded deference. In addressing this question, we turn first to the relevant language of section 17A.19(10)(*l*), which focuses on the agency's "interpretation of a provision of law whose interpretation has clearly been vested by a provision of law in the discretion of the agency." There is nothing in this language that restricts the "irrational, illogical or wholly unjustifiable" standard of review to interpretations embodied in an agency rule. Therefore, the fact that an agency's interpretation is made in the

course of a pending proceeding does not mean the agency's action cannot be reviewed under this more deferential standard.[5]

We have recently clarified and refined our analysis for deciding when an agency has been granted interpretative authority with respect to a statute. *See Renda v. Iowa Civil Rights Comm'n*, 784 N.W.2d 8, 10–14 (Iowa 2010). In the absence of an express statement by the legislature granting interpretive authority to an agency, we review "the precise language of the statute, its context, the purpose of the statute, and the practical considerations involved" to determine whether the interpretation of a statute has been clearly vested in the discretion of the agency. Arthur E. Bonfield, *Amendments to Iowa Administrative Procedure Act, Report on Selected Provisions to Iowa State Bar Association and Iowa State Government* 63 (1998) [hereinafter "Bonfield, *Amendments to Iowa Administrative Procedure Act*"]. This search for legislative intent focuses on the specific statutory provision or language at issue. *Renda*, 784 N.W.2d at 12. Indications that an agency has interpretive authority include rule-making authority, decision-making or enforcement authority that requires the agency to interpret the statutory language, and the agency's expertise on the subject or on the term to be interpreted. *Id.* at 12–14.

With respect to the department of revenue, the legislature has granted the department "the power and authority to prescribe all rules not

---

[5]In *General Electric Co. v. Iowa State Board of Tax Review*, this court held the department of revenue was not entitled to deference with respect to the matter at issue in that case. 702 N.W.2d 485, 489 (Iowa 2005). We noted there was no "agency regulation that [was] directly on point," and therefore, the agency had "no official interpretation to which [the] court should defer." *Id.* In reaching this conclusion, we relied on our decision in *City of Marion v. Iowa Department of Revenue & Finance*, 643 N.W.2d 205, 206–07 (Iowa 2002). In *City of Marion*, we gave the department's interpretation of a statute, as set forth in an agency rule, "appropriate deference" under section 17A.19(11)(*c*). 643 N.W.2d at 207. We did not state, however, that *only* an interpretation found in an agency rule could be given deference. We disavow any contrary implication in our *General Electric* opinion.

inconsistent with the provisions of [chapter 422], necessary and advisable for its detailed administration and to effectuate its purposes." Iowa Code § 422.68(1). Moreover, the department director's enforcement power certainly requires the director to interpret the Code provisions relevant to a taxpayer's liability. *See id.* § 422.70 (detailing director's power to ascertain correctness of return and to hold hearings on that issue). We have held in prior cases that the legislature has given the department discretion to interpret chapter 422. *See, e.g., Ranniger v. Iowa Dep't of Revenue & Fin.,* 746 N.W.2d 267, 268 (Iowa 2008); *City of Sioux City v. Iowa Dep't of Revenue & Fin.,* 666 N.W.2d 587, 590 (Iowa 2003).

Notwithstanding these indications of interpretive discretion, it is difficult to find a clear legislative delegation of interpretive authority with respect to the precise statutory term at issue here—"manufacturer." Significantly, the dispute here does not center on an interpretation of the manufacturing exemption in general or even on an interpretation of the statutory definition of "manufacturer." The issue here is simply whether a retail establishment can be considered a "manufacturer" under the statutory definition of that term. The insurmountable obstacle to finding the department has authority to interpret the word "manufacturer" in this context is the fact that this word has already been interpreted, i.e., explained, by the legislature through its enactment of a statutory definition. *See id.* §§ 422.45(27)(*d*)(4), 428.20. Under these circumstances, we do not think the legislature intended that the department have discretion to interpret—give meaning to—this term.

Because the legislature has not clearly vested the interpretation of the word "manufacturer" in the discretion of the agency, the deferential standard of review in section 17A.19(10)(*l*) does not apply. Accordingly, we review the

agency decision on this issue to determine whether it was "[b]ased upon an erroneous interpretation of a provision of law." *See id.* § 17A.19(10)(*c*).

## IV. Parties' Positions.

Sherwin-Williams contends the statutory definition of "manufacturer" is unambiguous and clearly encompasses the equipment used in its retail stores to produce usable paint. It asserts:

> Sherwin-Williams holds personal property for the purpose of adding to its value by a process of combining different materials, specifically precisely measured base and colorants, with a view to selling the newly created colored paint for a gain or profit.

Notably, the director similarly opined in his decision, "It is true that Sherwin-Williams may hold property, mix materials, and sell the combined product for a profit."

Nonetheless, the department contends that only equipment used by one whose principal business is manufacturing is exempt. It suggests two reasons for this result: (1) the term "manufacturer" is ambiguous, and ambiguous terms in a tax exemption statute must be interpreted in favor of taxation; and (2) allowing the exemption to be applied to a retail establishment would produce the absurd result of including "as manufacturers restaurants, bars, lemonade stands, and various home-improvement stores." To avoid such a broad and absurd interpretation of this tax exemption, argues the department, the word "manufacturer" must be interpreted consistently with its common meaning, encompassing only those whose principal business is manufacturing. Because the equipment at issue here is used in establishments whose principal business is retail sales, the department argues the manufacturing exemption does not apply.

In considering the parties' arguments, we keep in mind that " '[t]ax exemption statutes are construed strictly, with all doubts resolved in favor of taxation.' " *Dial Corp. v. Iowa Dep't of Revenue*, 634 N.W.2d 643, 646 (Iowa

2001) (quoting *Heartland Lysine, Inc. v. State,* 503 N.W.2d 587, 588 (Iowa 1993)). Sherwin-Williams, as the party relying on the exemption, bears the burden of proving it is entitled to the benefit of the exemption. *See id.*

### V. Discussion of "Manufacturer" Definition.

We commence our discussion by determining whether the term "manufacturer" is ambiguous. "A statute is ambiguous if reasonable minds could differ or be uncertain as to the meaning of the statute." *Carolan v. Hill,* 553 N.W.2d 882, 887 (Iowa 1996); *accord* 2A Norman J. Singer & J.D. Shambie Singer, *Statutes and Statutory Construction* § 46:4, at 179 (7th ed. 2007) [hereinafter "*Sutherland Statutory Construction*"] ("A statute is ambiguous when it is capable of being understood by reasonably well-informed persons in two or more different senses."). "Ambiguity may arise from specific language used in a statute or when the provision at issue is considered in the context of the entire statute or related statutes." *Midwest Auto. III, LLC v. Iowa Dep't of Transp.,* 646 N.W.2d 417, 425 (Iowa 2002); *accord State v. McCullah,* 787 N.W.2d 90, 94 (Iowa 2010) ("Ambiguity arises in two ways—either from the meaning of specific words or 'from the general scope and meaning of the statute when all of its provisions are examined.'" (quoting *Carolan,* 553 N.W.2d at 887)).

It is significant that the legislature has chosen to define the word "manufacturer" as used in the manufacturing exemption. "We recognize the legislature 'may act as its own lexicographer.' When it does so, we are normally bound by the legislature's own definitions." *State v. Fischer,* 785 N.W.2d 697, 702 (Iowa 2010) (quoting *Henrich v. Lorenz,* 448 N.W.2d 327, 332 (Iowa 1989)). Under these circumstances, " 'the common law and dictionary definitions which may not coincide with the legislative definition must yield to the language of the legislature.' " *Hornby v. State,* 559 N.W.2d 23, 25 (Iowa 1997) (quoting *State v. Steenhoek,* 182 N.W.2d 377, 379 (Iowa

1970)). Therefore, this court is obligated to apply the statutory definition of "manufacturer" as written, absent an ambiguity in that definition.

The department has not directed this court to any language in the statutory definition that is capable of being reasonably understood to require that a "manufacturer" be principally engaged in the business of manufacturing. Rather, it relies on this court's decision in *Associated General Contractors of Iowa v. State Tax Commission,* 255 Iowa 673, 123 N.W.2d 922 (1963), in which we held the term "manufacturer" as used in Iowa Code section 422.42(11) (1958) was ambiguous.

In *Associated General Contractors,* the tax commissioner sought to impose a use tax on a paving contractor's mixing of asphaltic concrete that it then used to pave the roadbed. 255 Iowa at 674, 123 N.W.2d at 922–23. Iowa Code section 422.43 (1958) imposed a tax on "all sales of tangible personal property . . . sold at retail in the state to consumers or users." *Id.* at 677, 123 N.W.2d at 924. The commissioner relied on section 422.42(11), which provided that " 'a sale at retail' " included the use of " 'tangible personal property *by the manufacturer thereof,* as building materials . . . in the performance of construction contracts or for any other purpose *except for resale* or processing.' " *Id.* at 674, 123 N.W.2d at 923 (emphasis added) (quoting Iowa Code § 422.42(11) (1958)).

At that time, the term "manufacturer" was defined in section 428.20 similarly to the current definition, and this statutory definition was, by its own terms, applicable to chapter 422. *Id.* at 675, 123 N.W.2d at 923; *see also* Iowa Code § 428.20 (1958) (defining "manufacturer" as one who adds to the value of personal property by any process of manufacturing "with a view to selling the same for gain or profit"). Prior to the legislature's enactment of section 422.42(11), this court had suggested the intent underlying the statutory definition of "manufacturer" in section 428.20

"was to exempt from taxation manufacturers who are engaged in manufacturing personal property *for sale,* and not builders or 'constructors' who are engaged in erecting permanent structures, such as paving, which become a permanent part of the real estate."

*Id.* (emphasis added) (quoting *In re Koss Constr. Co.,* 214 Iowa 125, 128, 241 N.W. 495, 497 (1932)).[6]

The ambiguity in section 422.42(11) arose from the fact that this statute in essence provided that the manufacturer was the consumer of the manufactured product. *Id.* at 677, 123 N.W.2d at 924. In other words, the use contemplated in section 422.42(11) did not contemplate a sale of the manufactured personal property to another party. Yet, that statute used the defined term, "manufacturer," which this court had interpreted to contemplate a sale of the manufactured goods.

The commissioner argued the legislature used the term "manufacturer" in section 422.42(11) in a sense different than the meaning set forth in section 428.20, intending that term to encompass "one who performs construction contracts making an article for use in performance of such contracts." *Id.* at 676, 123 N.W.2d at 923. This court noted the ordinary meaning of "manufacturer" supported the commissioner's interpretation of the statute. *Id.* at 677–78, 123 N.W.2d at 924. For several reasons, however, we concluded the term "manufacturer" in section 422.42(11) had the meaning ascribed to that term in section 428.20, and

---

[6]It is clear from a reading of *In re Koss Construction Co.* that the factor prompting the court to hold that a paving contractor was not a "manufacturer" was that the contractor did not sell the product it manufactured. We said in our opinion,

[i]t is apparent from the stipulation that the appellee does not make a product and sell it to some other party who in turn uses it to make a pavement. It not only "combines" the several ingredients, but it uses this combination itself in making the finished product which becomes a permanent part of the realty.

*In re Koss Constr. Co.*, 214 Iowa at 127, 241 N.W. at 496.

therefore, the paving contractor was not a "manufacturer" and was not subject to the use tax. *Id.* at 680, 123 N.W.2d at 926.

We do not find our conclusion that the term "manufacturer" was ambiguous as used in section 422.42(11) to be persuasive authority for finding the term "manufacturer" ambiguous as used in the manufacturing exemption. As our decision in *Associated General Contractors* made apparent, there was an inherent conflict in section 422.42(11) because its express terms encompassed a use that did not include a sale, which was at odds with the statute's reference to "the manufacturer," a defined term that envisioned a sale of the manufactured goods. The department has identified no similar, inherent conflict in section 422.45(27)(*a*)(1). Section 422.45(27)(*a*)(1) exempts sales of equipment "used in processing by a manufacturer," a concept compatible with the statutory definition of "manufacturer."

Perhaps the most support for the department's position found in the *Associated General Contractors* opinion is the following statement by this court regarding an agency rule that referred to a "manufacturer": "The word 'manufacturer' as used in [the agency rule] is used in the sense of one whose principal business is manufacturing." 255 Iowa at 679, 123 N.W.2d at 925. The basis for this conclusion is not apparent from our opinion.[7] More importantly, however, this statement was not pertinent to our resolution of

---

[7]The agency rule provided:

"Where a manufacturer uses or consumes tangible personal property which has been made, compounded, fabricated or assembled by him, he is liable for either retail sales or use tax as the case may be. The measure of the tax is two per cent of the cost of the manufacture of the tangible personal property so used and consumed."

*Associated Gen. Contractors*, 255 Iowa at 678, 123 N.W.2d at 925 (quoting agency rule 10). The court did not explain how this language supported the conclusion that the rule refers to "one whose principal business is manufacturing."

the statutory interpretation issue in that case, which depended on whether one could be a "manufacturer" if one did not intend to sell the manufactured property to another. Whether a manufacturer was only "one whose principal business is manufacturing" was not outcome determinative in that case or even pertinent to the basis for our ultimate decision. This court's observation regarding the agency rule was, therefore, dicta. *See Wilson v. Farm Bureau Mut. Ins. Co.*, 714 N.W.2d 250, 260 (Iowa 2006) (refusing to follow reasoning expressed in prior case because it was dicta, stating reasoning was not pertinent to issue that resulted in reversal); *Keystone Nursing Care Ctr. v. Craddock*, 705 N.W.2d 299, 308 (Iowa 2005) (disavowing discussion of statute in prior case with respect to specific factual scenario, concluding it was dicta because claim made in prior case did not involve facts addressed in dicta).

Although the department has not demonstrated an ambiguity arising from the language of the statutory definition of "manufacturer," an ambiguity may arise from the general scope of the statute when it is considered in its entirety. As noted earlier, the department claims a literal interpretation of the statutory definition of "manufacturer" would result in application of the manufacturing exemption to businesses that typically are not viewed as being engaged in manufacturing. The department suggests such a broad application of the exemption is absurd.

This court has said that, "[w]here the language is of doubtful meaning, *or where an adherence to the strict letter would lead . . . to absurdity*, or to contradictory provisions, the duty of ascertaining the true meaning devolves upon the court."[8] *Case v. Olson*, 234 Iowa 869, 872, 14 N.W.2d 717, 719

---

[8]This court has also noted that "[a]voidance of unreasonable or absurd consequences is one of several rules of construction courts apply *only in case of ambiguity*." *Kruck v. Needles*, 259 Iowa 470, 478, 144 N.W.2d 296, 301 (1966) (emphasis added). Notwithstanding this statement, we believe that, when a literal interpretation of a statute

(1944) (emphasis added); *accord Sutherland Statutory Construction* § 45:12, at 101 ("It is fundamental, however, that departure from the literal construction of a statute is justified when such a construction would produce an absurd and unjust result and would clearly be inconsistent with the purposes and policies of the act in question."). Nonetheless, we are mindful of the cautionary advice of one commentator that "the absurd results doctrine should be used sparingly because it entails the risk that the judiciary will displace legislative policy on the basis of speculation that the legislature could not have meant what it unmistakably said." *Sutherland Statutory Construction* § 45:12, at 105–07. The Hawaii Supreme Court articulated the proper balance in such situations when it stated:

> [E]ven in the absence of statutory ambiguity, departure from literal construction is justified when such construction would produce an absurd and unjust result and the literal construction in the particular action is clearly inconsistent with the purposes and policies of the act.

*Pac. Ins. Co. v. Or. Auto. Ins. Co.*, 490 P.2d 899, 901 (Haw. 1971).

As noted, the department contends application of the manufacturing exemption to establishments whose principal business is retail sales produces an absurd result. The absurdity of this result is not self-evident, however. Although it may appear counterintuitive, we will not ignore clear legislative language merely because it leads to a result that seems contrary to the court's expectations. *See State ex rel. Miller v. Cutty's Des Moines Camping Club, Inc.*, 694 N.W.2d 518, 524–25 (Iowa 2005) (relying on statutory definition, even though it was counterintuitive).

The department points out a potential contradiction, however, observing the same definition of "manufacturer" at issue here applies to

---

results in absurd consequences that undermine the clear purpose of the statute, an ambiguity arises.

property-tax issues. *See generally Sutherland Statutory Construction* § 46:4, at 188–89 ("Even when a statute appears unambiguous on its face it can be rendered ambiguous by its interaction with and its relation to other statutes."). Under the agency rules applicable to property taxes, the agency classifies as industrial only "manufacturing establishments." Iowa Admin. Code r. 701—71.1(6)(*a*). Under this rule, which we quoted previously,

> [a] manufacturing establishment is a business entity in which *the primary activity* consists of adding to the value of personal property by any process of manufacturing, refining, purifying, the packing of meats, or the combination of different materials with the intent of selling the product for gain or profit.

*Id.* (emphasis added). In contrast, the department's classification rules provide that "commercial real estate" includes land and structures "which are *primarily used* or intended as a place of business where goods, wares, services, or merchandise is stored or offered *for sale at wholesale or retail*." *Id.* r. 701—71.1(5) (emphasis added). Sherwin-Williams' retail stores are assessed for property-tax purposes as commercial real estate, not industrial real estate.

The primary-use requirement employed in classifying property as industrial or commercial makes sense because the *entirety* of the real estate (land, improvements, and structures) is subject to property tax. Therefore, the whole must be classified as either industrial or commercial; it cannot be both. *See id.* r. 701—71.1(1) ("There can be only one classification per property. An assessor shall not assign one classification to the land and a different classification to the building or separate classifications to the land or separate classifications to the building (dual classification)."). It makes sense, then, that the classification of the whole would depend on the primary use of the property.

But for purposes of taxing the *use of equipment* located on the property, it is not absurd or illogical to impose the tax based on the use of the specific equipment as opposed to the taxpayer's use of the premises as a whole. *See Heartland Lysine, Inc.,* 503 N.W.2d at 589 (stating "the propriety of a use tax assessment or exemption turns largely on the specific use made of the property"). Consequently, we are not convinced it would be absurd for the legislature to accord a retailer a manufacturer's exemption when specific equipment is used by the retailer in the same manner and for the same purpose as such equipment would be used by a taxpayer whose principal business is manufacturing.[9]

---

[9]Our research revealed two state agency proceedings in which a taxing authority considered the very process at issue here—the mixing of base and colorants to produce usable paint—for purposes of determining the applicability of relevant tax statutes. *See The Sherwin-Williams Co. v. Comm'r of Revenue*, No. C259901, 2003 WL 21040567 (Mass. App. Tax Bd. May 9, 2003) (administrative review of decision of the commissioner of revenue); Op. Comm'r of Tax. & Fin., No. TSB–A–99(21)5, 1999 WL 304816 (N.Y. Tax. Comm'r April 8, 1999) (advisory opinion of commissioner of taxation and finance). In both proceedings, Sherwin-Williams' retail outlets were given tax treatment reserved for manufacturers or manufacturing, some indication that the application of Iowa's manufacturing exemption to Sherwin-Williams' retail outlets is not absurd.

In the Massachusetts administrative proceeding, the appellate tax board ruled that Sherwin-Williams' retail stores in that state qualified as "manufacturing corporations" based on their business of "mix[ing] colorants with base paint to create colored paints" for sale. 2003 WL 21040567, at *1, *5. The facts before the board showed that "77% of Sherwin-Williams' sales are from the sale of paint, and that 80–90% of those sales are sales of colored paint produced at the retail stores." *Id.* at *2. The board stated these activities

> fall within the broad definition ascribed to manufacturing of "change wrought through the application of forces directed by the human mind, which results in the transformation of some preexisting substance or element into something different, with a new name, nature or use."

*Id.* at *5 (quoting *Assessors of Boston v. Comm'r of Corps. & Taxation*, 84 N.E.2d 129, 136 (Mass. 1949)).

In the New York tax commissioner's advisory opinion, Sherwin-Williams asked whether its "mixing and blending machinery and equipment, and related computer equipment, used in the paint tinting process" in its company-owned retail stores were exempt from sales and use tax. 1999 WL 304816, at *1. It relied on an exemption for " '[m]achinery or equipment for use . . . directly and predominantly in the production of tangible personal property . . . by manufacturing, processing . . . .' " *Id.* at *2 (quoting N.Y. Tax Law § 1115(a)(12)). The commissioner opined that "the Color Matching Systems, Automatic Colorant Dispensers, Shakers and related computer equipment [were] used

The department also contends giving a retailer like Sherwin-Williams the benefit of the manufacturing exemption is contrary to the purpose underlying this exemption. Quoting an Oklahoma case, the department suggests "[t]he object of this exemption was undoubtedly to encourage manufacturing industries to locate in the state." *Dairy Queen of Okla., Inc. v. Okla. Tax Comm'n*, 238 P.2d 800, 802 (Okla. 1951). An Arizona court, however, has suggested a broader purpose of such an exemption: "The purpose is to encourage manufacturing businesses and *investment in manufacturing equipment* by exempting sales of such equipment." *Ariz. Dep't of Revenue v. Blue Line Distrib., Inc.*, 43 P.3d 214, 216 (Ariz. Ct. App. 2002) (emphasis added). We cannot conclude that allowing Sherwin-Williams an exemption for its investment in equipment to process paint at its retail locations in Iowa is *contrary* to our legislature's purpose in adopting a manufacturing exemption. *See State v. Hopkins*, 465 N.W.2d 894, 896 (Iowa 1997) (stating court looks "beyond the ordinary meaning of the statutory language when a statute's literal terms are *in conflict* with its general purpose" (emphasis added)). A significantly stronger showing that legislative intent would be undermined by permitting an exemption under the facts of this case is required before we will ignore the statutory definition of "manufacturer." *See Sutherland Statutory Construction* § 46:4, at 178 ("The plain meaning of the statute is conclusive, except in a case where a literal application of the statute will produce a result *demonstrably at odds* with the intention of the drafters." (Emphasis added.)).

We have also examined four cases cited by the department in support of its position and conclude they are readily distinguishable. *See Blue Line Distrib.*, 43 P.3d 214; *HED, Inc. v. Powers*, 352 S.E.2d 265 (N.C. Ct. App.

_____

directly in the production of paint for sale" and, therefore, were exempt from sales and use tax. *Id.* at *4.

1987); *McDonald's Corp. v. Okla. Tax Comm'n*, 563 P.2d 635 (Okla. 1977); *Dairy Queen of Okla., Inc.*, 238 P.2d 800. In each of these cases, retail establishments, Little Caesar's Pizza, Hardee's, McDonald's, and Dairy Queen, were denied the benefit of a manufacturing exemption from sales or use tax because they were not a manufacturer or did not engage in manufacturing within the meaning of the statutory exemption. *Blue Line Distrib.*, 43 P.3d at 216; *HED, Inc.*, 352 S.E.2d at 267; *McDonald's Corp.*, 563 P.2d at 641; *Dairy Queen of Okla., Inc.*, 238 P.2d at 802.

In the Arizona case, the exemption applied to sales of " '[m]achinery, or equipment, used directly in manufacturing, [and] processing . . . operations. The terms "manufacturing" [and] "processing" . . . as used in this paragraph refer to and include those operations *commonly understood within their ordinary meaning.*' " *Blue Line Distrib.*, 43 P.3d at 215 (emphasis added) (quoting Ariz. Rev. Stat. § 42–5061(B)(1) (Supp. 2000)). Given the absence of a statutory definition of "manufacturing," there was no barrier to the reviewing court's acceptance of the agency's rule that interpreted the exemption as applying only to " '[m]anufacturing [as] the performance *as a business* of an integrated series of operations' that transform personal property into a different product." *Id.* (quoting Ariz. Admin. Code r. 15–5–120(A)). Applying this agency rule, the Arizona court concluded a Little Ceasar's pizzeria is not commonly understood to be a manufacturing operation. *Id.* at 216.

The North Carolina exemption considered in the *HED, Inc.* case applied to "manufacturing industries and plants." 352 S.E.2d at 266. Like the Arizona statute, the North Carolina statute did not define these terms, so the court applied the common meaning of these words. *Id.* The North Carolina court reviewed decisions from other jurisdictions that had considered whether a restaurant qualifies as a manufacturer, and observed:

> One discernible pattern is that when the statutes do not provide a definition of manufacturing, as is the case in North Carolina, courts tend to apply a common sense approach and conclude that a restaurant is not a manufacturer. On the other hand, when the statute does provide a definition, that definition is mechanically applied and courts conclude that a restaurant is a manufacturer.

*Id.* at 267. Relying on the common meaning of "manufacturing," the North Carolina court concluded a Hardee's restaurant was not a "manufacturing" industry or plant. *Id.*

In Oklahoma, the manufacturing exemption is more explicit. It allowed an exemption for the use of certain machinery and equipment " 'used by persons in the operation of manufacturing plants.' " *McDonald's Corp.*, 563 P.2d at 636 (quoting Okla. Stat. tit. 68, § 1305(p) (1971)). The Oklahoma statute further states: " 'The term "manufacturing plants" shall mean those establishments *primarily engaged* in manufacturing or processing operations, *and generally recognized as such.*' " *Id.* (emphasis added) (quoting Okla. Stat. tit. 68, § 1305(p)). Clearly, the Oklahoma court's decisions in *McDonald's Corp.* and *Dairy Queen of Oklahoma, Inc.* are readily distinguishable given the clearly expressed legislative intent that the exemption only be given to businesses primarily engaged in manufacturing. The comparable Iowa statute simply does not contain that limitation.[10]

Finally, we state that we are also influenced by the legislative history of the manufacturing exemption. As we explained earlier in our opinion, prior to the 1997 amendment, the exemption encompassed machinery and equipment (1) "*used in the manner* described in section 428.20" and (2) qualifying as "real property within the scope of section 427A.1[(1)(*e*)]." Iowa

---

[10]Some states specifically exclude certain businesses or establishments that incidentally engage in manufacturing or processing. *See, e.g.*, *Elias Bros. Rests., Inc. v. Treasury Dep't*, 549 N.W.2d 837, 839 (Mich. 1996) (applying exemption that excluded " 'the preparation of food and beverages by a retailer for retail sale' " (quoting Mich. Comp. Laws § 205.94(g)). Iowa's statutory exemption does not do so.

Code § 422.45(27) (1997) (emphasis added). Section 427A.1(1)(*e*) referred to machinery used in "manufacturing establishments," a term not defined by the legislature. *Id.* § 427A.1(1)(*e*). The prior statute did not use the term "manufacturer" and did not otherwise unambiguously incorporate that term or its full definition into the manufacturing exemption other than to incorporate "the manner" of use of the machinery and equipment as described in section 428.20. Under the prior statute, therefore, the agency had much greater leeway in interpreting the term "manufacturing establishment" in a manner consistent with its meaning in the property-law context.

When the legislature amended the manufacturing exemption in 1997, however, it had the stated intent to broaden its applicability. To achieve this purpose, the legislature removed the reference to section 427A.1(1)(*e*) and its focus on "manufacturing establishments" and in its place imposed the requirement that the entity seeking the exemption be a "manufacturer" "as defined in section 428.20." We are convinced it would be contrary to the principles that guide our interpretation of legislative enactments to ignore these changes and give the exemption the same meaning with respect to the taxpayers who qualify for the exemption that this statute had prior to its amendment in 1997.

Accordingly, we reject the department's contention that only those taxpayers who are primarily engaged in manufacturing are eligible for the exemption. The department's interpretation of section 428.20 is, therefore, erroneous. We agree with the district court that Sherwin-Williams qualifies as a "manufacturer" under section 422.45(27).

### VI. Direct Use of Spectrographic Color-Matching Machine.

In addition to concluding Sherwin-Williams was not a "manufacturer," the department's director ruled the spectrographic color-matching machine

did not qualify for the exemption because it was not "directly and primarily used in processing" as required by section 422.45(27)(*a*)(1). Before we determine whether this ruling should be upheld, we address the standard applicable to our review.

**A. Standard of Review.** The director's decision turned on whether the color-matching machine was used "directly" in processing. The term "directly" is not defined in the statute, but is defined in an agency rule. Sherwin-Williams does not question the agency's definition of this term. Rather, the dispute between the parties with respect to the color-matching machine is the director's application of that definition to the facts of this case.

In a contested case such as the one before us, the agency has discretion in its application of the law to the facts. *Iowa Ag Constr. Co. v. Iowa State Bd. of Tax Review*, 723 N.W.2d 167, 174 (Iowa 2006) (holding application of law to facts in proceeding in which taxpayer sought refund of sales/use tax was vested in the discretion of the agency); *see also Drake Univ. v. Davis*, 769 N.W.2d 176, 183 (Iowa 2009) (holding workers' compensation commissioner had discretion to apply the law to the facts in contested-case proceeding under workers' compensation statute). Therefore, the appropriate standard of review is found in Iowa Code section 17A.19(10)(*m*). *Iowa Ag Constr. Co.*, 723 N.W.2d at 174 (applying standard of review found in section 17A.19(10)(*m*) to agency's application of law to facts in decision denying sales/use tax refund); *see also Insituform Techs., Inc. v. Employment Appeal Bd.*, 728 N.W.2d 781, 801 (Iowa 2007) (applying same standard of review to agency's assessment of penalty for OSHA violation).

Section 17A.19(10)(*m*) provides:

> The court shall reverse, modify, or grant other appropriate relief from agency action, equitable or legal and including declaratory relief, if it determines that substantial rights of the person seeking judicial relief have been prejudiced because the agency action is any of the following:
>
> . . . .
>
> *m.* Based upon an irrational, illogical, or wholly unjustifiable application of law to fact that has clearly been vested by a provision of law in the discretion of the agency.

A decision is "irrational" when it is "not governed by or according to reason." *Webster's Third New International Dictionary* 1195. A decision is "illogical" when it is "contrary to or devoid of logic." *Id.* at 1127. A decision is "unjustifiable" when it has no foundation in fact or reason. *See id.* at 2502 (defining "unjustifiable" as "lacking in . . . justice"); *id.* at 1228 (defining "justice" as "the quality or characteristic of being just, impartial or fair"); *id.* (defining "just" as "conforming to fact and reason"). One commentator has suggested that the "irrational, illogical, or wholly unjustifiable" standard of review is substantively similar to "the unreasonable, arbitrary, capricious, and abuse of discretion standards." Bonfield, *Amendments to Iowa Administrative Procedure Act* 69.

**B. Discussion.** As noted, the department asserts the spectrographic color-matching machine does not qualify for the tax exemption because it is not "directly and primarily used in processing" as required by section 422.45(27)(*a*)(1). The color-matching machine determines the mixing formula to achieve the precise color desired. In explaining his decision that this machine did not qualify for the exemption, the director stated:

> The Spectrograph machine does not come into contact with the base or final product being purchased by the customer in any way. This machine does not change the substance or color of the paint. Instead, this color eye only provides Sherwin-Williams with a formula for the color of paint desired by the customer. Consequently, . . . the Spectrograph machine is one

step removed from processing and would not qualify for the exemption from Iowa sales tax under this statute.

Iowa Code section 422.45(27)(*d*)(5) defines processing as "a series of operations in which materials are manufactured, refined, purified, created, combined or transformed by a manufacturer, ultimately into tangible personal property." The statute does not define "directly," but an agency rule states that "[p]roperty is 'directly used' only if it is used to initiate, sustain, or terminate an exempt activity." Iowa Admin. Code r. 701—18.58(1). This rule suggests three factors to consider in determining whether property is "directly used":

> 1. The physical proximity of the property in question to the activity in which it is used;
>
> 2. The proximity of the time of use of the property in question to the time of use of other property used before and after it in the activity involved; and
>
> 3. The active causal relationship between the use of the property in question and the activity involved.

*Id.* Rule 701—18.58(1) also states: "The fact that a particular piece of property may be essential to the conduct of the activity because its use is required either by law or practical necessity does not, of itself, mean that the property is directly used." The agency's definition is consistent with the dictionary meaning of "directly": "without any intervening space or time : next in order." *Webster's Third New International Dictionary* 641; *see Iowa Ag Constr. Co.*, 723 N.W.2d at 176 (noting department's definition of "directly" as used in the section 422.45(39) exemption tracked dictionary definition, citing Iowa Admin. Code r. 701—18.48(1)(*e*)).

Applying the agency rule and the factors deemed relevant to determining when property is "directly used" in processing, we conclude the agency's decision that the color-matching machines do not qualify for the manufacturing exemption is wholly unjustifiable. In contrast to the

machinery and equipment considered in the cases cited by the department, which we discuss below, the color-matching machine plays an integral role in the actual processing of usable paint. This machine initiates the in-store process of manufacturing usable paint by selecting the formula for the customer's desired color. The color-matching machine is integrated with the mini accutinter, sending the formula directly to the mini accutinter where the proper type and amount of colorant is dispensed into the can of base paint. The color-matching machine is located in physical proximity to the mini accutinter and the mixer/shaker. The time of use of the color-matching machine is immediately prior to the tinting of the base paint. In addition, the color-matching machine has an active causal connection to the processing of the paint, dictating the type and amount of colorant and base paint used in that process. We are convinced the director's contrary conclusion does not conform to the facts and is an unreasonable application of the agency rule.

We have studied the four cases upon which the department relies to support the director's determination that the color-matching machines are not "directly used" in processing paint and find them distinguishable. In *Iowa Ag Construction Co.*, we affirmed the denial of an exemption for a mower used to cut grass around hog confinement centers and associated sewage lagoons because it was not used directly in the production of livestock, as required by the exemption. 723 N.W.2d at 180–81. The mower was not part of the process of raising the livestock; it simply supported the ancillary environment for that process, a very different situation than that presented in the case before us.

In *Heartland Lysine*, this court affirmed the department's denial of an exemption for electrical equipment that regulated the flow of electricity in a lysine plant to ensure the production equipment provided the environment

necessary for the manufacture of lysine. 503 N.W.2d at 590–91. The exemption at issue in that case required that the equipment " 'be directly and primarily used in the manner described in section 428.20 in processing tangible personal property.' " *Id.* at 590 (quoting Iowa Code § 422.45(27) (1987)). Noting the electrical equipment's function was "preliminary to the actual processing," this court held the equipment did not "directly perform the manufacturing functions contemplated by section 428.20." *Id.* at 591. In contrast, the color-matching machine at issue in the present case initiates the tinting process by sending the required formula to the mini accutinter which then dispenses colorant into the base in accordance with that formula. *See* Iowa Admin. Code r. 701—18.58(1) ("Property is 'directly used' only if it is used to *initiate*, sustain, or terminate an exempt activity." (Emphasis added.)).

A third case cited by the department, *Dial Corp.*, 634 N.W.2d 643, involved an exemption that also had the same language as the statute at issue in the present appeal: "directly and primarily used in . . . processing." 634 N.W.2d at 647 (quoting Iowa Code § 422.45(27) (1997)). In *Dial Corp.*, we affirmed the denial of the taxpayer's exemption request for machinery and equipment that produced usable electricity for the assembly line, holding the equipment played "no part in changing the form, context or condition" of the product being manufactured. *Id.* at 648–49. Citing *Heartland Lysine*, we also noted the equipment's "function [was] preliminary to processing, *not part of it.*" *Id.* at 649 (emphasis added). As the undisputed facts in the present case show, the function of the color-matching machine is not "preliminary to processing"; rather, this machine initiates the process, a function falling within the agency rule.

Finally, in *Dain Manufacturing Co. v. Iowa State Tax Commission*, 237 Iowa 531, 22 N.W.2d 786 (1946), we held a drill grinding machine "used to

service the machinery or equipment that was being 'directly' used in the actual act of processing property" was not within an exemption for equipment "directly used" in manufacturing. 237 Iowa at 538, 22 N.W.2d at 790–91. We noted the drill grinding machine "did not come in physical contact with the property that was being made salable *or . . . take any part in the actual processing of that property.*" *Id.* at 538, 22 N.W.2d at 791 (emphasis added). This case is also clearly distinguishable from the case before us in which the color-matching machine played an integral part in the actual processing of the paint.

While these cases provide some illumination of the meaning of "directly used," the department's own rule on this subject is the most pertinent to our analysis. Focusing on that rule, we conclude the department's application of its rule to the facts of this case to reach a conclusion that the color-matching machines are not "directly used" in processing salable paint has no foundation in fact or reason and is, therefore, wholly unjustifiable. Accordingly, we reverse the department's decision holding the color-matching machines are not eligible for the manufacturing exemption.

### VII. Conclusion and Disposition.

We hold Sherwin-Williams qualifies for an exemption from use tax for the spectrographic color-matching machines, dispensing/tinting machines, known as mini accutinters, and the mixers/shakers used in its retail stores to process base paint and colorant into usable, salable paint. The decision of the court of appeals and the judgment of the district court are affirmed. We remand this case to the district court for remand to the department for further proceedings consistent with our opinion.

**DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED; CASE REMANDED.**

All justices concur except Wiggins, J., who takes no part.