# IN THE SUPREME COURT OF IOWA

No. 14–0640

Filed April 15, 2016

Amended July 19, 2016

**DEANNA JO RAMIREZ-TRUJILLO,**

Appellant,

vs.

**QUALITY EGG, L.L.C., WRIGHT COUNTY EGG DIVISION,** and **SELECTIVE INSURANCE COMPANY OF AMERICA,**

Appellees.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg, Judge.

Both parties seek further review of a court of appeals decision upholding a ruling of the Workers' Compensation Commission. **DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED WITH INSTRUCTIONS.**

Mark S. Soldat of Soldat, Parrish-Sams & Gustafson, PLC, West Des Moines, for appellant.

Richard G. Book of Huber, Book, Cortese & Lanz P.L.L.C., West Des Moines, for appellees.

**WIGGINS, Justice.**

An employee injured her back at work. Her employer acknowledged its liability for the injury and authorized care. The employer paid for the cost of the care the employee received to treat the back injury through September 30, 2009. The employee brought a workers' compensation claim seeking reimbursement of medical expenses she incurred for additional back treatment between May 2010 and April 2011 and workers' compensation benefits for the same period. The employer argued it did not authorize the medical expenses the employee incurred between May 2010 and April 2011. The employer also maintained the expenses did not have a causal connection to her compensable workplace injury. The workers' compensation commissioner concluded the treatment the employee received between May 2010 and April 2011 was not causally related to her workplace injury. However, the commissioner held the employer was liable for the claimed medical expenses because the employer failed to notify the employee it was no longer authorizing care as required by Iowa Code section 85.27(4) (2009). Both parties sought judicial review.

The district court reversed the final agency decision in part, concluding the agency misinterpreted section 85.27(4). Both parties appealed, and we transferred the case to the court of appeals. The court of appeals reversed the district court in part, concluding the district court erroneously interpreted section 85.27(4).

Both parties sought further review, which we granted. On further review, we will let the court of appeals decision stand as the final decision of this court to the extent it affirmed the district court decision affirming in part the final agency decision. However, we find the commissioner erroneously interpreted Iowa Code section 85.27(4).

Accordingly, we affirm in part and vacate in part the decision of the court of appeals, affirm in part and reverse in part the district court judgment, and remand the case to the district court with instructions to remand the case to the commissioner for further proceedings consistent with this opinion.

## I. Background Facts and Proceedings.

On August 1, 2009, Deanna Ramirez-Trujillo slipped on an egg on the floor at her workplace in Clarion, Iowa. Although Ramirez-Trujillo managed to catch herself and did not fall to the floor, she injured her back. Her employer, Quality Egg, L.L.C., Wright County Egg Division, completed an incident report acknowledging her workplace injury.

Quality Egg authorized Wright Medical Center to evaluate and treat Ramirez-Trujillo. Physician assistants at Wright Medical Center treated Ramirez-Trujillo for acute low back strain and severe muscle spasms on August 3, 7, 13, 21, and 31. At each visit, Ramirez-Trujillo signed the bottom of the authorization form to release her medical records to Quality Egg and its insurer, Selective Insurance Company of America. After her August 3 visit, her health care provider released her to return to work with restrictions.

Throughout the months of August and September, Ramirez-Trujillo received prescription medications, transcutaneous electrical nerve stimulation treatment, and physical therapy. Though she received an authorization form from Quality Egg each time she saw a physician assistant at Wright Medical Center, she did not receive any authorization forms for her physical therapy appointments. On September 30, Ramirez-Trujillo had a follow-up appointment with a physician assistant at Wright Medical Center. Quality Egg once again authorized Wright Medical Center to evaluate and treat Ramirez-Trujillo, and she once

again signed the authorization form to release her medical records to Quality Egg and its insurer. The physician assistant released Ramirez-Trujillo to full duty without any work restrictions. The physician assistant's notes indicated Ramirez-Trujillo's back strain was resolving and no follow-up care was required. The notes also indicated Ramirez-Trujillo could return to the clinic should further problems arise.

On December 26, Ramirez-Trujillo sought treatment for low back pain radiating up to her head and down to her toes at the emergency room at Wright Medical Center. She received an injection, prescriptions for several medications, and a temporary work release. The physician assistant's notes indicated Ramirez-Trujillo said the pain had begun after she shoveled snow the previous day. She returned to work on December 29.

On May 1, 2010, Ramirez-Trujillo again sought treatment for low back pain at the emergency room at Wright Medical Center. She received two injections, prescriptions for several medications, and a temporary work release. The treating physician advised Ramirez-Trujillo to seek follow-up care in one week. The physician's notes acknowledged Ramirez-Trujillo's historical problems with back pain and indicated there had been no clear triggers for her pain that day.

Over the next several weeks, Ramirez-Trujillo received follow-up care from a physician assistant and a doctor at Wright Medical Center. She began physical therapy and continued to take prescription medication. On May 17, Ramirez-Trujillo reported her pain was gone and she felt ready to return to work. The doctor released her to full duty without work restrictions. During a follow-up appointment on June 9, however, Ramirez-Trujillo reported she was still experiencing intermittent low back pain and muscle spasms.

On June 13, Ramirez-Trujillo again sought treatment at the emergency room at Wright Medical Center. An x-ray of her lumbar spine showed disc space narrowing at L5-S1. Her treating physician prescribed medication and instructed her to seek follow-up care. The physician's notes indicated Ramirez-Trujillo said she had been experiencing intermittent back pain since she injured her back when she slipped on an egg at work.

On June 14, Ramirez-Trujillo sought follow-up care at Wright Medical Center. The doctor who treated Ramirez-Trujillo ordered an MRI, which revealed a prominent disc extrusion with mild to moderate spinal stenosis at L5-S1. The doctor's notes indicated Ramirez-Trujillo said she had previously injured her back at work but characterized her recent pain as a separate episode. The notes also indicated Ramirez-Trujillo expressly stated "this is not workman's comp." The doctor referred Ramirez-Trujillo to orthopedic surgeon Mark Palit.

On June 28, Dr. Palit saw Ramirez-Trujillo at Wright Medical Center and administered a steroid injection. On July 19, Dr. Palit saw Ramirez-Trujillo at a follow-up appointment. Because Ramirez-Trujillo reported she continued to experience severe pain, Dr. Palit offered to perform decompression surgery. Dr. Palit's notes indicated Ramirez-Trujillo told him the August 2009 slip injury had resolved with conservative care by October 2009 and said she did well until May 2010 when she was going up some stairs and her back locked up.

On August 4, Dr. Palit performed decompression surgery on Ramirez-Trujillo. Dr. Palit discharged her from Wright Medical Center the following day. Ten days later, she sought treatment at the emergency room at Wright Medical Center due to drainage occurring at the surgical site and received an antibiotic to treat cellulitis. Ramirez-Trujillo

attended follow-up appointments with Dr. Palit at Wright Medical Center in August, September, and October. Ramirez-Trujillo sought further treatment in November and December for increased pain in her back radiating to her right hip and foot. Dr. Palit prescribed medication and physical therapy. Between the date of the surgery and the end of the year, she received three temporary work releases from Dr. Palit. However, each work release covered only a few days.

At a follow-up appointment on January 3, 2011, Dr. Palit imposed work restrictions on Ramirez-Trujillo and ordered another MRI of her lumbar spine due to her continuing pain. The MRI revealed a recurrent disk protrusion at L5-S1. Ramirez-Trujillo attended several additional follow-up appointments during January and February, during which she received prescriptions and a steroid injection. On March 23, Dr. Palit performed a revision of the decompression surgery. He discharged Ramirez-Trujillo from Wright Medical Center the following day.

This appeal follows from a notice and petition Ramirez-Trujillo filed with the workers' compensation commissioner against her employer and its insurer[1] on October 13, 2010. She sought workers' compensation benefits, penalty benefits, and medical expenses she incurred from May 2010 through April 2011.[2] Quality Egg stipulated Ramirez-Trujillo sustained an injury in the course of her employment on August 1, 2009, that caused her a temporary disability. Additionally, Quality Egg stipulated the treatment Ramirez-Trujillo received was reasonable and necessary and the fees charged by her care providers were fair and

---

[1]Throughout the remainder of this opinion, "Quality Egg" refers to Ramirez-Trujillo's employer and its insurer.

[2]Ramirez-Trujillo did not seek reimbursement of the medical expenses she incurred during December 2009.

reasonable. Quality Egg argued it did not authorize the medical expenses Ramirez-Trujillo incurred between May 2010 and April 2011. Quality Egg also argued those medical expenses did not have a causal connection to her compensable workplace injury. However, Quality Egg did not dispute the medical expenses Ramirez-Trujillo incurred were at least causally connected to the medical condition upon which her claim of injury was based.

The evidence presented at the arbitration hearing established medical providers treated Ramirez-Trujillo for low back strains and spasms on several occasions dating back to the time when she was eleven years old, but that her prior back issues had resolved before her August 2009 work injury.[3]

Ramirez-Trujillo submitted a written evaluation and report prepared by Dr. Robin Epp, a certified independent medical examiner. Based on a physical examination of Ramirez-Trujillo and a review of her medical records, Dr. Epp concluded Ramirez-Trujillo's back condition and the treatment she received after September 30, 2009, were directly and causally related to her work injury and her subsequent work activities. Ramirez-Trujillo's testimony and other testimony by lay witnesses supported Dr. Epp's opinion.

Quality Egg submitted a written medical opinion prepared by Dr. Donna Bahls. Based on her review of a portion of Ramirez-Trujillo's medical records, Dr. Bahls concluded neither the work injury nor Ramirez-Trujillo's subsequent work activities contributed to the periods

---

[3]Ramirez-Trujillo had previously visited Wright Medical Center for treatment of back pain even before she began working for Quality Egg. In January 2006, Ramirez-Trujillo went to the emergency room at Wright Medical Center, complaining of lower back pain after slipping and falling on ice.

of disability she experienced after the December 2009 shoveling incident. Dr. Bahls further concluded neither the work injury nor Ramirez-Trujillo's subsequent work activities prior to the shoveling incident caused her disk to herniate. Rather, Dr. Bahls concluded the shoveling incident or other events Ramirez-Trujillo mentioned to her doctors caused the periods of disability she experienced and the medical care she received on and after December 26, 2009.

Quality Egg also submitted an exhibit on which Dr. Palit indicated his agreement with the following statement:

> Dr. Palit do you agree that it is your opinion that you cannot state with reasonable medical certainty that the central and right paracentral prominent disc extrusion at L5-S1 with mild to moderate stenosis shown on the MRI, the symptoms reported by Ms. Ramirez-Trujillo in May-July 2010, the herniated nucleus pulposus at L5-S1 that you diagnosed, the surgery you performed on August 4, 2010 described as an L5-S1 bilateral hemilaminotomy, foraminotomy and discectomy and the revision of the L5-S1 surgery that you performed were caused by or related to the injury of August 1, 2009?

Two employees testified and submitted written statements on behalf of Quality Egg, including one employee who was Ramirez-Trujillo's supervisor and another who was her coworker. Both employees testified to hearing Ramirez-Trujillo state she had slipped or fallen on some stairs at home.[4] In addition, Ramirez-Trujillo's supervisor testified regarding various conversations he claimed to have had with her in which she admitted the condition she was seeking treatment for at the time was not work-related.

---

[4]Though Ramirez-Trujillo admitted her back once locked up as she walked up the three stairs outside her home, she denied ever having fallen down them. Her testimony suggested those were the only stairs at her home.

The deputy commissioner issued an arbitration decision extensively summarizing the above facts and testimony. The arbitration decision expressly addressed the credibility of the witnesses, including both the lay witnesses who testified and the expert witnesses whose reports the parties submitted as exhibits. The deputy commissioner also made numerous legal conclusions, one of which is particularly relevant to this appeal. Namely, the deputy commissioner concluded Ramirez-Trujillo's condition after September 30, 2009, was not the result of her August 2009 work injury. The deputy commissioner thus denied Ramirez-Trujillo's claims for workers' compensation benefits and medical expenses incurred after September 30, 2009.

Ramirez-Trujillo appealed to the workers' compensation commissioner. The appeal decision affirmed and adopted the majority of the arbitration decision, noting the hearing deputy's findings of fact and conclusions of law could be adequately separated for review on appeal and giving deference to the hearing deputy's credibility assessments. The appeal decision thus affirmed the hearing deputy's conclusion that the medical expenses Ramirez-Trujillo incurred from May 2010 through April 2011 were not causally related to the August 2009 work injury. However, the appeal decision nonetheless awarded Ramirez-Trujillo the medical expenses she incurred from May 2010 through April 2011 and associated transportation expenses because she incurred them while seeking care from providers Quality Egg authorized and because Quality Egg conceded it failed to notify her it was not authorizing further treatment. The commissioner interpreted Iowa Code section 85.27(4) to require an employer to cover the cost of authorized care unless the employer satisfies its duty to monitor the care it authorizes and its duty

to notify the employee when further care is no longer authorized, even if the care provided is ultimately found to be unrelated to the work injury.

Quality Egg sought judicial review of the portion of the final agency decision ordering it to reimburse and hold Ramirez-Trujillo harmless for medical expenses she incurred after September 30, 2009. Ramirez-Trujillo asserted the agency erred in failing to comply with Iowa Code section 17A.16(1) and in applying legal standards on the issue of causation.

The district court affirmed the final agency decision in part and reversed it in part. The court concluded the agency did not violate section 17A.16(1) and did not err in finding Ramirez-Trujillo's condition after September 30, 2009, was not causally related to her work injury. However, the court also concluded the agency misinterpreted section 85.27(4). The court found Quality Egg reasonably believed Ramirez-Trujillo had recovered from the work injury and would not seek further care for that injury after September 30, 2009. It also found Quality Egg did not receive notice Ramirez-Trujillo was seeking further care after that date for conditions related to the work injury. The court therefore concluded Quality Egg was not liable for the expenses Ramirez-Trujillo incurred after September 30.

Ramirez-Trujillo appealed the district court judgment. We transferred the case to the court of appeals. The court of appeals affirmed the portion of the district court judgment affirming a portion of the final agency decision. However, the court of appeals concluded the district court erroneously interpreted section 85.27(4). Accordingly, the court of appeals reversed the portion of the district court judgment reversing the agency's determination that Quality Egg was liable to

Ramirez-Trujillo for the expenses she incurred from May 2010 through April 2011.

Both parties sought further review.

**II.  Scope of Review.**

When this court grants an application for further review, we retain discretion to review all the issues raised on appeal or in the application for further review, or only a portion thereof. *Gits Mfg. Co. v. Frank*, 855 N.W.2d 195, 197 (Iowa 2014). In exercising this discretion, we choose to review only the issue concerning the proper interpretation of Iowa Code section 85.27(4). Accordingly, the court of appeals decision will stand as the final decision to the extent it affirmed the district court judgment affirming portions of the final decision of the workers' compensation commissioner.

The standards set forth in Iowa Code chapter 17A govern judicial review of final decisions by the workers' compensation commissioner. *Westling v. Hormel Foods Corp.*, 810 N.W.2d 247, 251 (Iowa 2012); *see* Iowa Code § 17A.1(2). When the legislature has clearly vested authority to interpret statutory language in an agency, we will defer to an agency interpretation of that language. *Renda v. Iowa Civil Rights Comm'n*, 784 N.W.2d 8, 10–15 (Iowa 2010). Thus, when the legislature has clearly vested the agency with interpretive authority, we will reverse an agency decision only when its interpretation of statutory language is "irrational, illogical, or wholly unjustifiable." *Coffey v. Mid Seven Transp. Co.*, 831 N.W.2d 81, 88 (Iowa 2013) (quoting *NextEra Energy Res. LLC v. Iowa Utils. Bd.*, 815 N.W.2d 30, 37 (Iowa 2012)); *see* Iowa Code § 17A.19(10)(*l*), (11)(*c*). If the legislature did not clearly vest the agency with interpretive authority, however, we review questions of statutory interpretation for

correction of errors at law. *Westling*, 810 N.W.2d at 251; *see* Iowa Code § 17A.19(10)(*c*), (11)(*b*).

In determining whether the legislature has clearly vested interpretive authority in the workers' compensation commissioner, we consider the nature of the statutory language the agency has construed. *See Burton v. Hilltop Care Ctr.*, 813 N.W.2d 250, 256–57 (Iowa 2012). When the legislature has not explicitly granted interpretive authority, we must examine "the phrases or statutory provisions to be interpreted, their context, the purpose of the statute, and other practical considerations to determine whether the legislature intended to give interpretive authority to an agency." *Clay County v. Pub. Emp't Relations Bd.*, 784 N.W.2d 1, 4 (Iowa 2010) (quoting *Renda*, 784 N.W.2d at 11–12).

We are more likely to conclude the legislature clearly vested interpretive power in an agency when the agency necessarily must interpret the statutory language at issue in carrying out its duties and no relevant statutory definition applies. *Renda*, 784 N.W.2d at 12, 14. In addition, when the statutory language at issue is a substantive term within the special expertise of an agency, we generally conclude the legislature has vested the agency with authority to interpret it. *See NextEra Energy*, 815 N.W.2d at 37. Ultimately, however, we will defer to an agency interpretation only when we are firmly convinced "the legislature actually intended (or would have intended had it thought about the question) to delegate to the agency interpretive power with the binding force of law." *Renda*, 784 N.W.2d at 14 (quoting Arthur E. Bonfield, *Amendments to Iowa Administrative Procedure Act, Report on Selected Provisions to Iowa State Bar Association and Iowa State Government* 63 (1998)).

We have never before interpreted the statutory language at issue in this appeal, though we have previously interpreted statutory language in the same subsection of the Code. *See, e.g., Bell Bros. Heating & Air Conditioning v. Gwinn*, 779 N.W.2d 193, 202–08 (Iowa 2010). Therefore, we begin our analysis by determining whether the legislature clearly vested the workers' compensation commissioner with authority to interpret the statutory language at issue. *See, e.g., Gartner v. Iowa Dep't of Pub. Health*, 830 N.W.2d 335, 343 (Iowa 2013).

Iowa Code section 85.27(4) affords an employer who does not contest the compensability of a workplace injury a qualified statutory right to control the medical care provided to an injured employee. *R.R. Donnelly & Sons v. Barnett*, 670 N.W.2d 190, 195, 197 (Iowa 2003). It provides in relevant part,

> For purposes of this section, the employer is obliged to furnish reasonable services and supplies to treat an injured employee, and has the right to choose the care. *If the employer chooses the care, the employer shall hold the employee harmless for the cost of care until the employer notifies the employee that the employer is no longer authorizing all or any part of the care and the reason for the change in authorization.*

Iowa Code § 85.27(4) (emphasis added).

The legislature has not expressly vested the workers' compensation commissioner with authority to interpret the workers' compensation statutes in chapter 85. The fact the legislature has granted the commissioner authority to adopt and enforce rules necessary to the implementation of chapter 85 does not itself indicate the legislature has clearly vested the commissioner with authority to interpret it. *See Roberts Dairy v. Billick*, 861 N.W.2d 814, 817 (Iowa 2015).

Section 85.27(4) constitutes a bread-and-butter provision of the workers' compensation statute regularly administered by the

commissioner. The fact that an agency necessarily must interpret statutory language in carrying out its duties provides a potential basis for concluding the legislature clearly vested interpretive authority therein. *Renda*, 784 N.W.2d at 12, 14. However, we have previously declined to conclude the legislature clearly vested interpretive authority in the workers' compensation commissioner on this basis standing alone. *See Iowa Ins. Inst. v. Core Grp. of Iowa Ass'n for Justice*, 867 N.W.2d 58, 65, 77 (Iowa 2015). In fact, we have declined to defer to the commissioner's interpretations of various provisions of chapter 85 in recent years. *Id.* at 65. Moreover, section 85.27(4) contains no substantive terms uniquely within the interpretive expertise of the workers' compensation commissioner.

On balance, we are not firmly convinced the legislature intended to delegate authority to interpret section 85.27(4) to the workers' compensation commissioner. *See Renda*, 784 N.W.2d at 14. Accordingly, we will not defer to the commissioner's interpretation of section 85.27(4) and will substitute our own judgment for that of the commissioner should we conclude the commissioner's interpretation rests on an error at law. *See* Iowa Code § 17A.19(11)(*b*); *Renda*, 784 N.W.2d at 14–15.

### III. Analysis and Discussion.

When interpreting the statutory provisions contained in chapter 85 of the Iowa Code, our goal is to determine and effectuate the legislature's intent. *United Fire & Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 677 N.W.2d 755, 759 (Iowa 2004). To determine legislative intent, we look to the language chosen by the legislature and not what the legislature might have said. *Schadendorf v. Snap-On Tools Corp.*, 757 N.W.2d 330, 337 (Iowa 2008). Absent a statutory definition, we consider statutory

terms in the context in which they appear and give each its ordinary and common meaning. *Rojas v. Pine Ridge Farms, L.L.C.*, 779 N.W.2d 223, 235 (Iowa 2010). When reasonable persons could disagree as to what a statute means, the meaning of the statute is ambiguous. *Holstein Elec. v. Breyfogle*, 756 N.W.2d 812, 815 (Iowa 2008). Ambiguity may arise due to uncertainty concerning the meaning of particular words or upon examination of all the statute's provisions together in context. *Id.*

When the meaning of the statute is ambiguous, we may consider rules of statutory construction in our interpretive analysis. *Id.* We assess the statute in its entirety rather than isolated words or phrases to ensure our interpretation is harmonious with the statute as a whole. *Schadendorf*, 757 N.W.2d at 337. Because we presume the legislature included every part of the statute for a purpose, we avoid construing a statutory provision in a manner that would make any portion thereof redundant or irrelevant. *Rojas*, 779 N.W.2d at 231; *see* Iowa Code § 4.4(2). We also avoid construing statutory provisions in a manner that will lead to absurd results. *Iowa Ins. Inst.*, 867 N.W.2d at 75; *see* Iowa Code §§ 4.4(3), .6(5).

The primary purpose of the workers' compensation statute contained in chapter 85 is to benefit the worker. *Griffin Pipe Prods. Co. v. Guarino*, 663 N.W.2d 862, 865 (Iowa 2003). To this end, chapter 85 encourages employers to compensate employees who receive workplace injuries promptly and provides a forum for efficient resolution of workplace-injury claims with minimal litigation. *See Des Moines Area Reg'l Transit Auth. v. Young*, 867 N.W.2d 839, 847 (Iowa 2015); *Bell Bros.*, 779 N.W.2d at 202; *Flint v. City of Eldon*, 191 Iowa 845, 847, 183 N.W. 344, 345 (1921).

In enacting the right-to-choose provision in section 85.27(4), our legislature sought to balance the interests of injured employees against the competing interests of their employers. *Bell Bros.*, 779 N.W.2d at 202, 207; *IBP, Inc. v. Harker*, 633 N.W.2d 322, 326–27 (Iowa 2001). The statute imposes an affirmative duty on employers who concede the compensability of workplace injuries to furnish care to injured employees. *Bell Bros.*, 779 N.W.2d at 202. However, it also empowers employers who fulfill this obligation "to substitute their judgment for that of their injured employees on the important question of which medical professionals are best suited to diagnose and treat work-related injuries." *Baker v. Bridgestone*, 872 N.W.2d 672, 678 (Iowa 2015); *see R.R. Donnelly*, 670 N.W.2d at 195. In other words, the statute grants employers a limited right to choose who provides the care to an injured employee—a right that is modified by several statutory protections afforded to employees. *Bell Bros.*, 779 N.W.2d at 202–04.

Because our legislature sought to balance the interests of employers and the interests of injured employees in enacting section 85.27(4), the right of employers to control care is not absolute. *See Baker*, 872 N.W.2d at 678 n.3. Rather, an employer's right to control care is a limited or qualified right. *R.R. Donnelly*, 670 N.W.2d at 195, 197; *W. Side Transp. v. Cordell*, 601 N.W.2d 691, 693 (Iowa 1999); *see Bell Bros.*, 779 N.W.2d at 203–04. Thus, although the statute promotes the prompt resolution of claims without litigation, it also anticipates that workplace injuries can lead to disputes between employers and injured employees. *R.R. Donnelly*, 670 N.W.2d at 195; *see Bell Bros.*, 779 N.W.2d at 204.

At issue in this appeal is the second sentence of section 85.27(4), which provides,

> If the employer chooses the care, the employer shall hold the employee harmless for the cost of care until the employer notifies the employee that the employer is no longer authorizing all or any part of the care and the reason for the change in authorization.

We must determine how the legislature intended this sentence to modify the right of employers to choose care for injured employees.

The first half of the sentence provides an employer who chooses the care an injured employee receives "shall hold the employee harmless for the cost of care." When the term "shall" appears in a statute, it generally connotes the imposition of a mandatory duty. *In re Marriage of Thatcher*, 864 N.W.2d 533, 539 (Iowa 2015); *In re Det. of Fowler*, 784 N.W.2d 184, 187 (Iowa 2010). Moreover, rules of statutory construction set forth in the Iowa Code specify that in statutes enacted after July 1, 1971, the word "shall" imposes a duty unless otherwise specified by the legislature.[5] Iowa Code § 4.1(30)(*a*). Absent any ambiguity in a statutory definition, we are obligated to apply the statutory definition the legislature adopted to explain a statutory term. *Sherwin-Williams Co. v. Iowa Dep't of Revenue*, 789 N.W.2d 417, 425 (Iowa 2010). Accordingly, we interpret the plain language of section 85.27(4) to obligate employers to hold employees harmless for authorized medical expenses.

The remainder of the sentence clarifies the scope of this obligation. Namely, it provides an employer who chooses care for an injured employee has a corresponding duty to "hold the employee harmless for the cost of the care until the employer notifies the employee that the

---

[5]The legislature enacted the language in section 85.27(4) granting employers a right to choose care in 1976. 1976 Iowa Acts ch. 1084, § 3 (codified in relevant part at Iowa Code § 85.27 (1977)); *Bell Bros.*, 779 N.W.2d at 202 n.1. The legislature enacted the second sentence of section 85.27(4) in 2004. *See* 2004 Iowa Acts 1st Extraordinary Sess. ch. 1001, § 9 (codified at Iowa Code § 85.27(4) (2005)).

employer is no longer authorizing all or any part of the care and the reason for the change in authorization." Iowa Code § 85.27(4). The ordinary meaning of the word "until" is "up to the time that." *Webster's Third New International Dictionary* 2513 (unabr. ed. 2002). Thus, section 85.27(4) plainly indicates an employer who authorizes care is responsible for the cost of the care up to the time when the employer notifies the employee it is no longer authorizing care.

Because section 85.27(4) obligates an employer to notify an employee when it is no longer authorizing care, it also obligates an employer to determine when it no longer wishes to authorize care. With the power to choose the care comes the responsibility to monitor the care for the purpose of determining when further care will no longer be authorized.[6] An employer can easily reconsider whether it wishes to authorize further care when an authorized medical provider indicates an employee requires no further care for a workplace injury or when the employer authorizes a new provider to take over an employee's care. Therefore, the employer's statutory burden to monitor an injured employee's care is not an onerous one.

Section 85.27(4) balances this minimal burden with a significant corresponding benefit—a means of extinguishing the employer's ongoing obligation to pay for medical expenses following its acknowledgment of compensability and exercise of the right to choose care. Interpreting

---

[6]Though we conclude deference to the agency's interpretation is not appropriate, we note the commissioner previously reached the same conclusion in interpreting section 85.27(4). *See, e.g.*, *Warner v. Alpha's*, Iowa Workers' Comp. Comm'n No. 1269904, 2002 WL 32125384, at *6 (Sept. 9, 2002) ("An employer's act of directing the care and the claimant's compliance with the employer's directives binds defendants to pay the cost of the care that it chose. Employers are under an obligation to monitor the care they authorize and must pay for authorized care until the time they inform the employee that they are withdrawing authorization." (Citation omitted.)).

section 85.27(4) to reward an employer who monitors the care it authorizes and communicates to the employee when it is no longer authorizing care is consistent with our prior recognition that the legislature sought to balance the interests of employees and employers in enacting section 85.27(4). *Bell Bros.*, 779 N.W.2d at 202, 207; *IBP*, 633 N.W.2d at 326–27.

On the one hand, section 85.27(4) protects the right of employers to choose care in various ways. Once an employer's right to control medical care attaches under section 85.27(4), "it remains with the employer under the statute until the employer denies the injury is work-related, withdraws authorization of the care, or until the commissioner orders alternative care." *Bell Bros.*, 779 N.W.2d at 207. An employer's denial of compensability leads to the loss of its right to choose care only when it denies the claimed injury arose in the course and scope of employment. *Id.* Thus, when an employer acknowledges the injury an employee suffered is compensable, the employer does not forfeit its right to choose care just because it disagrees with the employee as to the nature or extent of the disability caused by the workplace injury. *Id.* Even after a dispute arises concerning the compensability of a portion of the injured employee's ongoing care, the employer is entitled to control ongoing care to treat injuries with respect to which it does not contest compensability. *See id.* After an employer relieves an employee of the burden of proving causation by acknowledging compensability and authorizing care, the employer may reinstate that burden to the extent it believes compensability is in doubt. *See id.* at 207–08.

On the other hand, section 85.27(4) safeguards the ability of employees to make decisions regarding the course of the care they receive. Nothing in the statute prevents an employee from obtaining

unauthorized care. *See id.* at 205; *see also R.R. Donnelly,* 670 N.W.2d at 197. In addition, nothing in the statute prevents an employee from obtaining reimbursement for expenses incurred in seeking unauthorized care upon an adjudication of compensability.[7] *Bell Bros.,* 779 N.W.2d at 206. Rather, an employee generally may recover medical expenses incurred in seeking unauthorized care upon proving by a preponderance of the evidence the care was reasonable and beneficial under the totality of the circumstances. *Id.* Moreover, when the employee believes the employer has not offered care promptly or has offered care that is unduly inconvenient or not reasonably suited to treat the injury sustained, the employee may apply with the workers' compensation commissioner for approval to seek alternate care.[8] *R.R. Donnelly,* 670 N.W.2d at 196; *W. Side Transp.,* 601 N.W.2d at 693. Thus, the commissioner retains authority to order the employer to pay for care chosen by the employee. *W. Side Transp.,* 601 N.W.2d at 693. Additionally, the statute instructs

---

[7]An employer may successfully assert a lack-of-authorization defense when an employee seeks reimbursement for unauthorized care obtained after the workers' compensation commissioner denies the employee's application for alternate care on the merits. *Bell Bros.,* 779 N.W.2d at 205; *R.R. Donnelly,* 670 N.W.2d at 197–98.

[8]Notably, the commissioner has adopted two regulations that bolster our conclusion an employee is entitled to be informed when an employer decides it will no longer authorize care. First, the commissioner will not hear the parties on an application for alternate care until the employee communicates the basis of his or her dissatisfaction to the employer. *See* Iowa Admin. Code. r. 876—4.48(4), (8); *see also* Iowa Code § 85.27(4) (stating an employee with reason to be dissatisfied with the care offered "should communicate the basis of such dissatisfaction to the employer, in writing if requested"). As a result, the employee cannot receive an order directing the employer to pay for alternate care until he or she knows that care will be denied by the employer. Second, the commissioner will dismiss an application for alternate care if the employer denies the condition for which care is sought is compensable. *R.R. Donnelly,* 670 N.W.2d at 196, 197; *see* Iowa Admin. Code r. 876—4.48(7). Thus, an employee needs to know whether to apply for alternate care or seek adjudication on compensability in order to avoid delayed reimbursement for expenses incurred in seeking care.

the commissioner to issue decisions on applications for alternate care within ten to fourteen days of their receipt. Iowa Code § 85.27(4).

As the foregoing overview makes clear, section 85.27(4) does not require employees to prove medical causation in order to establish employer liability for authorized medical expenses.[9] Rather, under section 85.27(4), an employer obtains the right to choose care only by conceding the compensability of the claimed injury. *Bell Bros.*, 779 N.W.2d at 207. That means before the employer chooses care and authorizes it, the employer must concede the claimed injury arose in the course and scope of employment. *See Lakeside Casino v. Blue*, 743 N.W.2d 169, 173 (Iowa 2007) (explaining that a compensable injury requires a connection between the injury and employment, which "is established by showing the injury arose out of and in the course of the worker's employment"). To interpret section 85.27(4) to require an employee seeking payment of authorized medical expenses to prove compensability after the employer has conceded compensibility would upset the delicate balance of employer and employee protections the legislature sought to achieve in enacting section 85.27(4). To do so would undermine the concept of authorized care and subject employees to retroactive liability for care they did not choose.[10] *See Iowa Ins. Inst.*,

---

[9]We note this conclusion is consistent with prior interpretations of section 85.27(4) by the commissioner. *See Warner*, 2002 WL 32125384, at *6 ("When an employer chooses the care it must pay for the care it chose, even if it later learns that it might not have been liable for that care if it had not directed the care.").

[10]We have never considered the question of whether section 85.27(4) requires an employee to prove compensability of the condition for which treatment was sought to establish an entitlement to reimbursement of authorized medical expenses. We once reinstated a ruling by the commissioner disallowing medical expenses because "the claimant had failed to present sufficient evidence to prove a causal connection between the conditions which were the subject of the treatment and the claimant's work-related injury." *Auxier v. Woodward State Hosp.-Sch.*, 266 N.W.2d 139, 144 (Iowa 1978). However, we did so because the trial court erroneously determined the claimant had

867 N.W.2d at 75 ("We have long recognized that statutes should not be interpreted in a manner that leads to absurd results."); *see also* Iowa Code § 4.4(3) (stating it is presumed the legislature intends statutes to effect just and reasonable results); *id.* § 4.6(5) (indicating a court may consider consequences in construing an ambiguous statute).

Conversely, it is apparent from the language of the statute the employer generally must choose the care as a precondition to being responsible for its costs. The operative phrase is "chooses the care," not "has chosen the same provider at some time in the past." Furthermore, the second sentence of subsection (4) must be read together with the first sentence, which states, "For purposes of this section, the employer . . . has the right to choose the care." Iowa Code § 85.27(4). Thus, the choice of care referenced in the second sentence of section 85.27(4) is a choice for purposes of the entire section—namely, section 85.27. And the overall purpose of the section is the treatment of "injuries compensable under [chapter 85]." *Id.* § 85.27(1). This further highlights that employer liability in section 85.27(4) is premised upon an employer's

---

established a causal connection between the conditions treated and the workplace injury as a matter of law. *See id.* In that case, we did not consider whether section 85.27(4) requires reimbursement of authorized medical expenses not causally connected to a workplace injury. *See id.* Because that question was not actually presented and decided in *Auxier*, we do not treat that case as controlling.

The commissioner's interpretation of the statute on this question is not entitled to deference. *See* Iowa Code § 17A.19(11)(*b*). Nonetheless, we note the commissioner no longer interprets section 85.27(4) to require an employee to demonstrate authorized medical expenses were causally connected to the workplace injury to establish an entitlement to reimbursement. *See, e.g., Norton v. Leonard Express, Inc.*, Iowa Workers' Comp. Comm'n No. 5027578, 2013 WL 482726, at *2 (Jan. 23, 2013) ("Employer[s] must pay for the care they authorize, even if that care was later on determined unrelated to the work injury."); *Lenzini v. Des Moines Area Cmty. Coll.*, Iowa Workers' Comp. Comm'n No. 5002823, 2003 WL 22513678, at *5 (Oct. 29, 2003) ("When an employer chooses the care it must pay for the care it chose, even if it later learns that it might not have been liable for that care if it had not directed the care.").

choice of care for a particular injury. Under the plain statutory language of section 85.27(4), it is not enough that the employee happened to show up for treatment at a health care provider to which the employer had referred the employee in the past.

Similarly, interpreting section 85.27(4) to impose liability on employers for any medical care an employee receives from an authorized medical provider would lead to absurd results. As we recently stated:

> We have long recognized that statutes should not be interpreted in a manner that leads to absurd results. In order to apply this well-established rule, we sometimes consider fact patterns other than the one before the court to determine if a particular statutory interpretation would have untoward consequences. That is part of the judicial function—to consider alternative statutory interpretations and see where those alternatives logically lead.

*Iowa Ins. Inst.*, 867 N.W.2d at 75–76 (citations omitted); *see* Iowa Code §§ 4.4(3), .6(5). Undoubtedly, the legislature did not intend an employer who acknowledged the compensability of a foot injury to be liable for expenses the employee incurred after getting the flu merely because the employee sought care at an authorized medical center.

Interpreting section 85.27(4) to require such a result would discourage employers from authorizing care for fear of incurring liability for conditions clearly unrelated to the workplace. For example, employers would be discouraged from authorizing care to a medical facility as opposed to an individual specialist in order to avoid liability for treatment the employee receives for unrelated conditions. It is unlikely the legislature intended that result, as employees retain the ability to exercise some degree of choice concerning who will treat their injuries when their employers authorize care from medical facilities rather than individual medical providers.

To illustrate, we note the provider at issue here is the Wright Medical Center located in Clarion, Iowa, the county seat of Wright County. The record does not indicate whether there are any other health care facilities or individual health care providers in Wright County, but clearly Wright Medical Center offers a wide array of services. From reviewing the medical records, we know it has an emergency room, a rehabilitation department, a family practice clinic, a specialty clinic, hospital beds, and facilities for surgeries and births. Undoubtedly, Quality Egg did not intend to bind itself to pay for any care Ramirez-Trujillo might receive at Wright Medical Center merely by authorizing her to seek care for her work injury at that facility.

Consequently, we conclude section 85.27(4) limits employer liability for authorized care to expenses incurred seeking care related to the medical condition or conditions for which the employee sought care in the aftermath of a workplace injury and upon which the employee's claim for workers' compensation benefits is based.[11]

Here, Quality Egg produced no evidence to suggest Ramirez-Trujillo did not incur the expenses she claimed seeking treatment for a back condition. In fact, Quality Egg conceded the medical expenses Ramirez-Trujillo incurred were at least causally connected to the medical condition upon which her claim of injury was based. Accordingly, under the foregoing analysis, it remains unclear whether Quality Egg was

---

[11]We previously determined section 85.27(4) implicitly limits employer liability for *unauthorized* care. *See Bell Bros.*, 779 N.W.2d at 206 (indicating an employee may generally recover medical expenses incurred in seeking unauthorized care upon proving by a preponderance of the evidence that such care was reasonable and beneficial under the totality of the circumstances). Because it would be unfair to impose the cost of care the employer chose on the employee merely because it was not reasonable or turned out not to be beneficial, we do not interpret section 85.27(4) to implicitly limit employer liability for *authorized* care in precisely the same manner.

required to hold Ramirez-Trujillo harmless for care she received from May 2010 through April 2011. This is because Quality Egg produced no evidence to show it notified Ramirez-Trujillo that it was not authorizing further care.

In essence, Quality Egg disputes the care Ramirez-Trujillo received from May 2010 through April 2011 was authorized care, even though it concedes it initially authorized her to seek care in the aftermath of her workplace injury.[12] Thus, Quality Egg argues a second limiting principle constrains employer liability for authorized care under section 85.27(4). Specifically, Quality Egg suggests an employer need only notify the employee it is no longer authorizing care to relieve itself of liability when a reasonable employer would know the injured worker continues to seek care. Quality Egg thus argues the statute imposes an obligation on employees to make sure care authorizations are still in force before seeking further care.

We disagree. Section 85.27(4) contains no language to suggest the legislature intended to obligate employees to make sure care authorizations remain in force before accepting care. Rather, the plain language of the statute obligates employers who authorize care for workplace injuries. Namely, an employer who authorizes care must pay for the cost of care until the employer notifies the employee it is no longer authorizing care. For purposes of determining whether an employer is liable for the cost of care an employee received after the employer authorized care for a workplace injury and failed to notify the employee it

---

[12]The statute requires an employer to hold an employee harmless for the cost of authorized care until it notifies the employee it is no longer authorizing care, but it does not indicate that care remains authorized until the employer notifies the employee it is no longer authorizing care. *See* Iowa Code § 85.27(4).

was not authorizing further care, it is irrelevant that the employer did not intend its authorization to remain in effect.[13]

Importantly, nothing in the language of section 85.27(4) suggests employees have a duty to investigate or a duty to inquire as to whether an authorization remains in effect before seeking care. To conclude the statute imposes such a duty on employees when the language of the statute clearly imposes a duty on employers would be inconsistent with our longstanding practice of construing chapter 85 liberally in favor of employees. *See Griffin Pipe Prods.*, 663 N.W.2d at 865. The legislature did not intend employees to fear they might have to pay for care they did not choose merely because they accepted it. Interpreting section 85.27(4) to impose a continuing obligation on employees to make sure the employer still authorizes care before accepting it would turn the statute on its head.

However, that does not mean the statute permits an employee to take advantage of an employer by seeking compensation after the fact for care the employee knew or should have known was not within the scope of the employer's prior authorization. Section 85.27(4) seeks to protect the employer who acknowledges an injury arose in the course and scope of employment and honors its obligation to "furnish reasonable services and supplies to treat an injured employee." Iowa Code § 85.27(4). We simply do not believe section 85.27(4) requires an employer to notify an employee it is no longer authorizing care when the employee knows or reasonably should know the care sought is for a condition unrelated to a compensable workplace injury or the prior authorization is no longer in

---

[13]We agree with the commissioner an employer "cannot revoke authorization retroactively to avoid liability for expenses previously incurred." *Warner*, 2002 WL 32125384, at *6.

effect. *See Iowa Ins. Inst.*, 867 N.W.2d at 75–76; *see also* Iowa Code §§ 4.4(3), .6(5).

Accordingly, we conclude an employer may establish it is not liable for the cost of care an employee received from an authorized medical provider if it proves by a preponderance of the evidence the employee knew or reasonably should have known either that the care was unrelated to the medical condition or conditions upon which the employee's claim for workers' compensation benefits is based or that the employer no longer authorized the care the employee received at the time the employee received it. With respect to the latter alternative, the determinative question is whether the totality of the circumstances indicates the employee knew or should have known the employer no longer authorized the care the employee received, not whether the employee believed the care was compensable when the employee received it. An employer may avoid liability by showing the employer gave the employee actual notice of a change in authorization as required by section 85.27(4).[14] Alternatively, the employer may prove the employee had knowledge of facts and circumstances that would have led a reasonable employee to conclude the employer was no longer authorizing care for the claimed injury.[15]

---

[14]In other words, the employer may disprove liability by showing it notified the employee that the employer was "no longer authorizing all or any part of the care and the reason for the change in authorization." Iowa Code § 85.27(4).

[15]Of course, if it turns out the care was related to a workplace injury, the employer must pay for care regardless of what the employee knew or should have known at the time unless the employer proves it notified the employee of a change in authorization. Employer liability for authorized care does not turn on the beliefs of the employee. *Warner*, 2002 WL 32125384, at *6 ("It is unreasonable to expect a claimant to have the medical expertise necessary to decide whether to accept the care directed by the employer upon the chance the employer might later deny liability for the condition being treated. Lay persons, such as claimant, are not competent to testify on the issue

We caution that the outcome under this test does not rely on the concepts of constructive knowledge or constructive notice because section 85.27(4) imposes no duty of knowledge on employees. *See Knowledge, Black's Law Dictionary* (10th ed. 2014) (defining "constructive knowledge"); *Notice, Black's Law Dictionary* (defining "constructive notice"). Likewise, it does not rely on the concepts of implied knowledge, implied notice, or inquiry notice because section 85.27(4) imposes no duty of inquiry on employees. *See Knowledge, Black's Law Dictionary* (defining "implied actual knowledge"); *Notice, Black's Law Dictionary* (defining "implied notice" and "inquiry notice").

In addition, we caution that the test we now adopt to determine employer liability for authorized medical expenses under section 85.27(4) does not turn on the subjective beliefs an employee holds with respect to compensability or medical causation.[16] Rather, it is an objective test. This distinction is important because employees are ordinarily laypersons without the expertise necessary to make accurate determinations regarding medical causation. *See Bradshaw v. Iowa Methodist Hosp.*, 251 Iowa 375, 383, 101 N.W.2d 167, 171 (1960). We long ago recognized that medical causation "is a question with respect to which only a medical expert can express an intelligent opinion." *Id.* Thus, an employee's subjective beliefs concerning the cause of a medical condition or the compensability of expenses incurred are ordinarily

_____

of medical causation because they lack competency to do so. They are no more competent when they are receiving the care than when testifying.").

[16]This conclusion arguably follows from the fact that employer liability for authorized care does not turn on the compensability of the injury. As the commissioner has recognized, it would be unreasonable for employer liability to turn on the beliefs of the employee. *Warner*, 2002 WL 32125384, at *6.

incompetent to prove or disprove compensability or medical causation.[17] *See Cedar Rapids Cmty. Sch. Dist. v. Pease*, 807 N.W.2d 839, 845 (Iowa 2011); *Bradshaw*, 251 Iowa at 383, 101 N.W.2d at 171. Moreover, in the context of determining whether an employer is liable for authorized care, compensability and medical causation are not even at issue in a claim for reimbursement.[18]

We conclude an employer may prove it is not liable for the cost of care an employee received from an authorized medical provider despite the employer's failure to give the notice section 85.27(4) requires under limited circumstances. However, when an employer seeks to avoid liability for care an employee received from an authorized provider and cannot prove it notified an employee it was not authorizing further care from that provider, the employer bears the burden of proving by a preponderance of the evidence the employee knew or reasonably should have known either that the care the employee received was unrelated to the medical condition or conditions upon which the employee's claim for

---

[17]It is irrelevant whether the employee's subjective belief was based on statements made by a medical professional. As the evidence before the hearing deputy in this case demonstrates and the commissioner surely knows, medical professionals often arrive at conflicting conclusions regarding medical causation. *See Warner*, 2002 WL 32125384, at *6 ("Medical experts commonly disagree as to the cause of a condition and an injured claimant cannot be held to know when to accept and when to reject the care the employer's physicians offer."). Generally, an expert opinion regarding medical causation is not determinative in a claim for workers' compensation benefits. *See Cedar Rapids Cmty. Sch. Dist. v. Pease*, 807 N.W.2d 839, 845 (Iowa 2011). Rather, it is within the province of the commissioner to accept or reject an expert opinion. *Id.*

[18]Employee statements indicating an employee subjectively believed the employer was no longer authorizing further care are relevant to determining whether the employee knew the employer was no longer authorizing care he or she received. However, because the overarching purpose of the workers' compensation statute is to protect workers, ambiguous statements should be construed as statements concerning causation or compensability and not as statements concerning the effectiveness of a prior authorization for care unless circumstances clearly suggest the latter interpretation is more appropriate. Employees are generally lay persons not familiar with the legal standards applied in assessing their workers' compensation claims.

workers' compensation benefits is based or that the employer no longer authorized the care the employee received at the time the employee received it.

In determining whether the employer has proven by a preponderance of the evidence the employee knew or reasonably should have known it no longer authorized the care the employee received at the time the employee received it, the commissioner shall consider the following facts and circumstances: (1) the method in which the employer communicated to the employee that care was authorized throughout the period during which the employer concedes care was authorized; (2) the actual communications between the employer and employee throughout that period and thereafter concerning the injury, the care, and the costs of the care; (3) any communications between the employee and medical providers; (4) how much time passed between the date the employer authorized care and the date the employee sought the disputed care; (5) the nature of the injury for which the employer authorized care; (6) the nature of the care the employee received, including the overall course of the care and the frequency with which the employee sought or received care throughout the period during which the employer concedes care was authorized and thereafter; and (7) any other matters shown by the evidence to bear on what the employee knew or did not know with respect to the question of whether the employer authorized the care sought when the employee received it.  If the employer proves the employee knew or reasonably should have known the employer did not authorize further care when he or she received care from a previously authorized provider, the employer is not liable for the cost of the unauthorized care.

Our resolution of the statutory interpretation issue in this case protects the interests of both employers and employees and honors the legislature's intent in enacting and amending section 85.27(4). By construing section 85.27(4) to avoid potential due process problems that could arise when an employee is denied reimbursement of medical expenses without notice from the employer, our interpretation of section 85.27(4) is also consistent with the principle of constitutional avoidance. *See Auxier v. Woodward State Hosp.-Sch.*, 266 N.W.2d 139, 142 (Iowa 1978) (concluding a claimant's interest in workers' compensation benefits constitutes a property right an employer cannot terminate without prior notice).

The commissioner made no findings of fact that would permit us to assess whether Ramirez-Trujillo knew or reasonably should have known Quality Egg no longer authorized further care by Wright Medical Center for her back injury when she sought and received care from May 2010 through April 2011. Therefore, remand is appropriate because we are unable to determine from this record whether Quality Egg is liable for the medical expenses Ramirez-Trujillo incurred during this period under our interpretation of section 85.27(4). On remand, the commissioner should find the facts necessary to determine whether Quality Egg proved by a preponderance of the evidence that Ramirez-Trujillo knew or reasonably should have known Quality Egg no longer authorized further care for her back injury when she incurred the disputed medical expenses. If the commissioner allows further testimony, the commissioner may properly limit that testimony to matters as to which each witness has not previously testified. *Winnebago Indus. v. Smith*, 548 N.W.2d 582, 584 (Iowa 1996).

**IV. Disposition.**

We affirm in part the decisions of the court of appeals and the district court. The court of appeals decision stands as the final decision of this court to the extent it affirmed the district court decision affirming in part the final agency decision. We reverse in part the district court judgment and remand the case to the district court with instructions to remand the case to the commissioner for further proceedings consistent with this opinion.

**DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED WITH INSTRUCTIONS.**

All justices concur except Hecht, J., who dissents.

**HECHT, Justice (dissenting).**

Although the standard devised by the majority for determining whether an employer authorized medical care could have been adopted by the legislature, I do not believe it was. Accordingly, I respectfully dissent.

In relevant part, section 85.27(4) provides:

> For purposes of this section, the employer is obliged to furnish reasonable services and supplies to treat an injured employee, and has the right to choose the care. *If the employer chooses the care, the employer shall hold the employee harmless for the cost of care until the employer notifies the employee that the employer is no longer authorizing all or any part of the care and the reason for the change in authorization.* An employer is not liable for the cost of care that the employer arranges in response to a sudden emergency if the employee's condition, for which care was arranged, is not related to the employment.

Iowa Code § 85.27(4) (2009) (emphasis added).

The majority concludes this statute is ambiguous. It is not. If the "statutory language is plain and its meaning clear, 'we do not search for legislative intent beyond the express terms of the statute.' " *Denison Mun. Utils. v. Iowa Workers' Comp. Comm'r*, 857 N.W.2d 230, 235 (Iowa 2014) (quoting *State Pub. Defender v. Iowa Dist. Ct.*, 663 N.W.2d 413, 415 (Iowa 2003)).

As the majority correctly observes, it is well established that an employer "has the right to choose the care" for work-related injuries. Iowa Code § 85.27(4). This right to choose the care refers to an employer's power to designate which provider(s) of medical care will be authorized to treat the employee's injury. *See id.* Such control comes at a price. First, employers choosing providers of care generally concede

their employees' injuries are compensable.[19] *See Bell Bros. Heating & Air Conditioning v. Gwinn,* 779 N.W.2d 193, 202 (Iowa 2010) (noting employers receive the right to choose care "[o]nce compensability is acknowledged"); 15 James R. Lawyer, *Iowa Practice Series: Workers' Compensation* § 15:2, at 199 (2015) [hereinafter Lawyer] ("If the employer denies the compensability of an injury under the act, it cannot . . . seek to guide the care."). Second, employers hold their employees harmless for the cost of the care provided by the chosen providers. Iowa Code § 85.27(4); 15 Lawyer § 15:2, at 198–99.

Employers have significant power in the process of furnishing medical services as they select who shall be authorized providers. Employers can confer authorization of care by a provider; they can also reasonably terminate it. Authorization lasts "until the employer notifies the employee that the employer is no longer authorizing all or any part of the care and the reason for the change in authorization." Iowa Code § 85.27(4). The notice of a change in authorization does not conclusively cut off the employer's obligation to furnish medical services under section 85.27(1); it does, however, oblige the injured employee to prove medical causation as to any services obtained from unauthorized providers for treatment of a work-related injury. 15 Lawyer § 15:2, at 199 (noting the employer's obligation to provide medical services under section 85.27 extends to unauthorized medical care that "is beneficial in improving the worker's condition"). The commissioner applied the clear language of section 85.27(4) and concluded Quality Egg is obligated to pay for medical expenses Ramirez-Trujillo incurred for treatment by the

---

[19]Compensable injuries are those arising in the course and scope of employment. Iowa Code § 85.3(1).

authorized provider after September 2009 because Quality Egg failed to notify Ramirez-Trujillo that further treatment by that provider was not authorized. In this instance, I believe the commissioner correctly applied the statute.

The majority fashions a new standard for determining whether an employer's authorization of care can terminate notwithstanding the employer's failure to notify their injured employee of the termination. The new standard is problematic because it is not found within section 85.27(4). The statute is not ambiguous, so we need not apply rules of interpretation or develop new standards to divine its meaning. Section 85.27(4) expressly confers upon employers the right to "choose the care" and prescribes the consequences of an employer's choice of medical care for the employee. Iowa Code § 85.27(4). Among the consequences is the employer's obligation to hold employees harmless for the cost of services supplied by authorized providers. *Id.*

The legislature expressly prescribed only one safe harbor in which the employer's choice of care does not result in a concession of compensability: "An employer is not liable for the cost of care that the employer arranges in response to a sudden emergency if the employee's condition, for which care was arranged, is not related to the employment." *Id.* The unmistakable rationale for this safe harbor is that in emergent scenarios, employers do not have time to assess whether the injury or condition for which treatment is urgently needed arose out of and in the course of employment. Notably, Quality Egg makes no claim in this case that its authorization of the Wright Medical Center as a provider was granted in a sudden emergency.

Section 85.27(4) expressly exempts employers from their statutory duty to hold employees harmless from the cost of medical services

provided by authorized providers *if* employers give their employees notice that the authorization is terminated or changed. *Id.* Under the clear meaning of the statute, the employer's authorization of care for treatment of a compensable injury continues until the employer gives the employee notice of a change. The majority's new standard announces that an employer's notice terminating or changing authorization is not the only means of terminating authorization and avoiding the duty to hold the employee harmless. Under the new standard, employers can now avoid the consequences of choosing care—even if they fail to give the statutory notice—by proving the employee knew or should have known the care was beyond the scope or duration of the employer's authorization.

The majority's new standard allowing employers to avoid the consequences of choosing care without giving notice as contemplated in section 85.27(4) is problematic for several reasons. First, it is incompatible with the clear language of the statute indicating a provider is authorized until notice to the contrary is given. Second, I think the new standard will create confusion and uncertainty among parties in workers' compensation cases about whether medical care is authorized. Confusion and uncertainty will spawn more litigation—an untoward consequence for a workers' compensation system intended to be simple, quick, and inexpensive. *See, e.g., Baker v. Bridgestone/Firestone*, 872 N.W.2d 672, 677 (Iowa 2015); *Morrison v. Century Eng'g*, 434 N.W.2d 874, 877 (Iowa 1989); *Flint v. City of Eldon*, 191 Iowa 845, 847, 183 N.W. 344, 345 (1921). In place of the former predictable bright-line rule allocating to employers liability for medical care provided by authorized providers for work-related injuries until the authorization is withdrawn by notice, the majority's new standard encourages additional fact-based inquiries about what the employee knew about the scope and duration of

a provider's authorization and when she knew it. Employers will be motivated to litigate whether injured employees knew or should have known the care provided was for a condition outside the scope of the employer's authorization, or whether employees knew or should have known the authorization had expired under the circumstances even if the employer gave no notice of expiration as contemplated in section 85.27(4). Litigating these questions will make workers' compensation proceedings slower and more expensive as lawyers and fact-finders scrutinize the often complex factual circumstances addressed in the standard's numerous factors. As with any multifactored standard, fact-based outcomes will be more unpredictable than outcomes produced by the commissioner's bright-line rule. *See United States v. Mead Corp.*, 533 U.S. 218, 241, 121 S. Ct. 2164, 2178, 150 L. Ed. 2d 292, 312 (2001) (Scalia, J., dissenting) (criticizing "th'ol' 'totality of the circumstances' test" because it thwarts predictability and hampers "litigants who want to know what to expect"). With due respect, the clear language of the statute and its bright-line allocation of responsibility for care provided by authorized providers prior to notice of a change is far superior to (and far simpler than) the majority's new unwieldy standard.

I agree completely with the majority's conclusion that employees are not generally equipped to assess whether the condition for which they consult an authorized provider is attributable to a work-related injury. I am convinced this very understanding informed the legislature's choice of a bright-line rule allocating liability to employers for the cost of care provided by those they choose until employers give notice of the withdrawal or change of the provider's authorization. Iowa Code § 85.27(4) ("[T]he employer shall hold the employee harmless for the cost of care until the employer notifies the employee that the employer is no

longer authorizing all or any part of the care and the reason for the change in authorization.").

The majority designs the new standard to remedy unfairness it perceives in the risk that an employer might be required to pay for medical services provided by an authorized provider for a condition ultimately found not to have been causally connected to a compensable injury. But this risk is one the legislature built into the system as part of the delicate balance between the interests of injured employees and their employers in workers' compensation cases. *Bell Bros.,* 779 N.W.2d at 207 ("[T]he overall approach of section 85.27(4) [is] to balance the control given to the employer with safeguards for the employee."); *see also Baker,* 872 N.W.2d at 676–77 (describing the "series of tradeoffs" inherent in the workers' compensation system). Employers receive the opportunity to control the care under section 85.27(4). The price of this opportunity for control, as I have suggested above, includes employers' concessions of (1) the causal connection between the employment and the injury, and (2) medical causation—medical treatment reasonable in amount and necessary to treat the compensable injury. *See Bell Bros.,* 779 N.W.2d at 202.

I acknowledge the commissioner's decision in this case presents an instance in which an employer paid a price for its decision to control the medical care. The commissioner's decision held Quality Egg liable for some medical expenses the commissioner ultimately found causally unrelated to the compensable injury Ramirez-Trujillo sustained in August 2009.[20] The rationale for the commissioner's decision was based

---

[20]All of the disputed medical expenses were for treatment of Ramirez-Trujillo's back pain, not some part of the anatomy unaffected by the work-related injury. The legislature's bright-line hold harmless rule did not impose on Ramirez-Trujillo the

on Quality Egg's failure to give notice under section 85.27(4) that it had terminated the care provider's authority to treat Ramirez-Trujillo's back. In my view, the majority's newly-conceived multifactored standard for limiting the scope and duration of Quality Egg's authorization disrupts the balance of interests set by the legislature. The balance prescribed by the legislature afforded Quality Egg the opportunity to terminate its provider's authority to provide services by giving a simple notice to Ramirez-Trujillo. By giving such a notice, Quality Egg could have shifted the burden of proving medical causation back to Ramirez-Trujillo. But it failed to give the notice, and the commissioner therefore correctly ordered that Ramirez-Trujillo be held harmless for the cost of the care.

Employers' responsibility to hold injured employees harmless for care provided by authorized providers absent a termination notice—a feature of the delicate balance between the competing interests of employers and employees—does not impose an onerous burden. After choosing the care for injured employees, employers and their insurers routinely and regularly monitor the care through full access to medical records and information.[21] Armed with detailed information about their authorized providers' services and their employees' responses to treatment, employers are well-equipped to meet the responsibilities assigned to them under section 85.27(1) and protect their interests

_____

burden of sorting out before seeking treatment from the authorized provider whether the back pain she experienced after September 30, 2009, was causally related to the 2009 injury or some other unrelated activity such as scooping snow. The legislature reasonably, in my view, concluded such complex determinations are typically beyond the ken of lay people and are best left to medical experts. In short, the hold harmless obligation worked quite sensibly under the circumstances presented in this case.

[21]The employee or claimant making a claim for benefits must release "all information . . . concerning [their] physical or mental condition relative to the claim." Iowa Code § 85.27(2).

under section 85.27(4). Because they control the care under the statutory scheme, employers are readily able to give employees notice of "change[s] in authorization" when the employer chooses. Iowa Code § 85.27(4). This means of changing employers' authorizations of care renders the majority's multifactored standard completely unnecessary. In this case, Quality Egg could easily have withdrawn Wright Medical Center's authority to treat Ramirez-Trujillo's back at Quality Egg's expense in September 2009 when Ramirez-Trujillo was discharged from care, or in December 2009 when she returned to the provider with complaints arising after she shoveled snow—but it did not.

Because I believe the majority's new standard is unsupported by the clear language of section 85.27(4) and likely to create confusion and spawn more litigation, I would affirm the court of appeals decision and the commissioner's application of the statute.